No. 71,759

STATE OF KANSAS, DEPARTMENT OF ADMINISTRATION, *Appellant,* v. PUBLIC EMPLOYEES RELATIONS BOARD of the Kansas Department of Human Resources, *Appellee,* and KANSAS ASSOCIATION OF PUBLIC EMPLOYEES, *Intervenor/Appellee.*

(894 P.2d 777)

Opinion filed
March 10, 1995.

*Scott M. Gates*, of the Kansas Department of Administration, of Topeka, argued the cause and was on the briefs for appellant.

*Don Doesken*, of the Kansas Department of Human Resources, of Topeka, argued the cause and was on the brief for appellee Kansas Department of Human Resources.

*Scott A. Stone*, of the Kansas Association of Public Employees, of Topeka, was on the brief for intervenor-appellee Kansas Association of Public Employees.

The opinion of the court was delivered by

SIX, J.: This first impression case arises from the attempts of classified state employees to bargain. The perimeters of conflict surround the tension between the Public Employee-Employer Relations Act (PEERA), K.S.A. 75-4321 *et seq.*, and the Kansas Department of Administration (KDA) under the Civil Service Act, K.S.A. 75-2925 *et seq.*

The instant case involves a dispute between the KDA and the Kansas Association of Public Employees (KAPE), representing organized units of service and maintenance employees at Kansas State University (KSU) and Pittsburg State University (PSU). The KDA insists that a certain clause be included in any memorandum

of agreement between the employees and their respective universities. At issue is whether, or to what extent, the KDA's civil service regulations should preempt conflicting terms in a memorandum of agreement reached between a public employer and a group of classified employees organized and certified under PEERA. The KDA appeals from a decision of the district court affirming an order by the Public Employees Relations Board (PERB). Our jurisdiction is under K.S.A. 20-3018 (transfer from Court of Appeals on our motion).

We reason that: (1) the clause the KDA insists be included in the memorandum agreements is not a mandatorily negotiable item and (2) the legislature did not intend for KDA regulations to preempt conflicting terms of a PEERA employer-employee memorandum of agreement. The orders of the district court and PERB are affirmed as modified.

## FACTS

The parties submitted the case to PERB on stipulated facts.

### KSU Negotiations

In December 1988, negotiations commenced between KSU and its service and maintenance employees represented by KAPE. After almost two years of negotiation and mediation, KSU and KAPE reached a memorandum of understanding covering terms and conditions of employment. The Board of Regents ratified the memorandum. (The Regents supervise KSU and PSU. See K.S.A. 74-3201 *et seq.*; K.S.A. 1994 Supp. 76-712.)

The agreement was forwarded to the Secretary of the KDA, who rejected it. The Secretary advised the parties that the proposed agreement was disapproved because it lacked a certain provision that had been included, according to the Secretary, in "every existing and past memorandum of agreement between an employee organization and one or more state agencies." The language in question, which the parties have called a "savings clause" throughout these proceedings, provides as follows:

"Any provision of this Agreement which quotes any valid law, or Department of Administration regulation, all or in part, either directly or indirectly, shall be adhered to in its present form or as it may be subsequently amended and changed."

The clause is not a typical savings clause. The parties acknowledged the mislabeling as negotiations commenced, but because they have come this far identifying it as a savings clause, they are content to preserve the name for ease of reference. We agree that the clause has been mislabeled but will continue to preserve the name for uniformity in responding to the parties' contentions.

KSU had attempted to insert a similar clause in the proposed agreement during negotiations, but KAPE objected. KAPE contended that KSU would not be justified in going to impasse over the disputed savings clause because the clause was not a mandatory subject of bargaining under PEERA. Either agreeing with KAPE's legal opinion or declining to make an issue of it, KSU backed off the savings clause and continued negotiations on other disputed topics, eventually reaching a proposed agreement.

The KDA Secretary, however, insisted that the agreement contain the disputed language. He explained the purpose behind his insistence:

"The goal of the savings clause is to provide uniform application of statutes and Department of Administration regulations concerning civil service employees that are referred to or paraphrased in the memorandum of agreement. In particular, the clause ensures uniform, consistent application of the statutes and regulations in instances when they are amended after the memorandum has been signed."

KAPE responded by filing with PERB a prohibited practice complaint against the KDA. KAPE requested that PERB order the KDA to cease and desist insisting on the savings clause.

### PSU Negotiations

Similar negotiations took place at PSU between the university and KAPE on behalf of service and maintenance employees. These negotiations began in September 1989. When it became clear that the KDA would insist on the same savings clause, the PSU negotiations broke off and no proposed agreement was reached. KAPE filed a second prohibited practice complaint against the KDA on the same grounds as the KSU complaint. PERB consolidated the two cases for hearing.

### PERB's Decision

The "pivotal issue," according to PERB's presiding officer, was

whether the savings clause is a "mandatory" or "permissive" subject of bargaining. He explained the difference between mandatory and permissive as follows:

"Once a specific subject has been classified as a 'mandatory' subject of bargaining, the parties are required to bargain concerning the subject if it has been proposed by either party, and neither party may take unilateral action on the subject absent completion of the impasse procedure set forth in K.S.A. 75-4332. [Citation omitted.] A 'permissive' subject of bargaining falls outside of the K.S.A. 75-4322(t) definition of 'conditions of employment.' The parties may bargain by mutual agreement on a permissive subject, but neither side may insist on bargaining to the point of impasse. [Citation omitted.]"

The presiding officer concluded that the savings clause was not a mandatory subject of bargaining; therefore, the savings clause could not be insisted upon by the KDA.

The presiding officer noted that K.S.A. 75-4333(b) suggests prohibited practices can be committed only by a "public employer or its designated representative." Accordingly, the presiding officer next considered whether the KDA was acting as a "governing body," a "public employer," or a "designated representative" of a public employer when it insisted on the savings clause. Relying on *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 667 P.2d 306 (1983) (hereinafter *Pittsburg State*), the presiding officer held that the Board of Regents, not the KDA, was the governing body and the public employer.

Finally, the presiding officer considered whether the KDA acted as a designated representative of the Board of Regents in the KSU or PSU negotiations. He concluded that because the Board of Regents ratified the KSU agreement, the KDA was not a designated representative when it rejected the agreement; consequently, the KDA lacked authority to reject the agreement but did not commit a prohibited practice under PEERA.

The presiding officer held in the PSU case that the KDA acted as the Board of Regents' designated representative because the PSU negotiators expressly said that any agreement they reached would be subject to the KDA's approval. Thus, the KDA committed a prohibited practice by insisting on a nonmandatory topic in negotiations.

Implementation of the proposed agreement was ordered in the KSU case, as the agreement already had been ratified by the Board of Regents. The KDA was ordered to "cease and desist . . . interference with the agreement." In the PSU case, the KDA was ordered to cease and desist insisting on the savings clause. The tentative agreement, minus the savings clause, was to be reduced to writing and submitted to the Board of Regents for ratification and implementation.

## PERB's 3-2 Decision to Deny Review

The KDA petitioned PERB to review the presiding officer's decision. See K.S.A. 77-527(a). PERB denied the petition for review in a 3-2 decision. The presiding officer's order became final. See K.S.A. 77-526(b).

The PERB dissenters focused upon the effect they believed the PERB order would have on the Kansas civil service system:

"This order has adverse and far-reaching implications as it attempts to strip the Secretary of Administration of legislatively vested powers and turn the Civil Service System upside down. This order determines that changes in the State of Kansas Civil Service Regulations cannot be made without allowing organized units to meet and confer on them. This means that an Office Assistant II in the SRS Non-Professional Unit and an Office Assistant II in the Administrative Services Unit and an Office Assistant II in a non-organized unit may all receive different compensation. Civil Service stands for the proposition of equal pay for equal work."

## District Court's Decision

The KDA, under K.S.A. 75-4334(c), sought judicial review of PERB's order. The KDA named PERB as the respondent, although KAPE was the opposing party in the agency proceedings. KAPE later filed a motion to intervene, which was granted.

The district court affirmed PERB, holding that the savings clause could not be a mandatory subject of bargaining under the two-part test set forth in *Pittsburg State*, 233 Kan. at 816. The district court declined to discuss PERB's holding that the KDA is neither the governing body nor the public employer for the university classified service and maintenance employees, explaining:

"Such a determination is not relevant to the primary issue at hand nor helpful in resolving the real controversy of this case. Since the savings clause is not a

mandatory subject of negotiation it matters little who the public employer is. Who ever the public employer is they can not force the negotiation of a savings clause.

## Standard of Review

Judicial review of PERB action taken in response to a prohibited practice complaint is governed by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), 77-601 *et seq.* K.S.A. 75-4334(c). We review the agency action under the same standards as the district court. *Reed v. Kansas Racing Comm'n.*, 253 Kan. 602, 609, 860 P.2d 684 (1993). K.S.A. 77-623 provides that agency actions are reviewable by appellate courts as in other civil cases.

The legislature has empowered PERB "to effectuate the purposes and provisions" of PEERA. K.S.A. 75-4323(d)(3). Therefore, to the extent the issues turn on PERB's interpretations of PEERA, such interpretations are entitled to significant deference and, although not binding, should be upheld if supported by a rational basis. *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991). To the extent the issues require interpretations of other statutes such as the Civil Service Act, PERB's opinions are entitled to no deference. See *State Dept. of SRS*, 249 Kan. at 166.

## DISCUSSION

At issue is the legality of the KDA's insistence on the savings clause as a condition for its approval of PEERA agreements covering service and maintenance employee units at KSU and PSU. The KDA also seeks a clarification of its role under PEERA in the approval and implementation of such agreements, which we decline to address in light of our resolution of the primary issue.

## Background of PEERA

Although PEERA has been in effect nearly 23 years, it has been the subject of few appellate court opinions and relatively little legislative revision. Fundamental questions concerning the nature of PEERA and the position it occupies in the scheme of public employer-employee relations in Kansas remain clouded. We have recognized that PEERA has a unique nature as a "hybrid" labor

relations act, falling somewhere between a pure "meet and confer" act and a classic "collective bargaining" act. See *Pittsburg State*, 233 Kan. 801, Syl. ¶ 1.

PEERA became effective March 1, 1972. Questions soon developed about the balance it struck between the rights of public employees and their employers. Accordingly, in 1975 and 1976, the legislature appointed a special interim committee to study PEERA and recommend improvements. Proposal No. 44, Public Employer-Employee Relations, Report on Kansas Legislative Interim Studies to the 1976 Kansas Legislature 803.

The 1976 special committee recommended amendments that would "make clear that this is a 'meet and confer' act." Proposal No. 44, p. 806. The proposed amendments were introduced as S.B. 629. One specific proposal in S.B. 629 would have amended K.S.A. 75-4330(a), which defines the permissible scope of a PEERA memorandum of agreement. The S.B. 629 proposal would have added a fifth exception (there were four then and now) to expressly forbid such agreements from containing "any adjustment or change in any rule or regulation of the secretary of administration, [or] any adjustment or change in the classification plan or the pay plan for the classified service under the Kansas civil service act or in any other pay schedule of the state." Proposal No. 44, p. 830. S.B. 629 moved among several House and Senate Committees and eventually died when the Senate Judiciary Committee failed to concur in amendments to the bill made by a House Committee of the Whole.

In 1980, Professor Raymond Goetz published a comprehensive article examining the nature and operation of PEERA. See Goetz, *The Kansas Public Employer-Employee Relations Law*, 28 Kan. L. Rev. 243 (1980). Goetz noted that PEERA imposed upon public employers the affirmative duty to "meet and confer in good faith" which included the obligation to "endeavor to reach agreement." 28 Kan. L. Rev. at 283-84. However, PEERA failed to provide public employees with all of the rights afforded unions in the private sector. Goetz concluded PEERA was neither a pure "meet and confer" act nor a pure "collective bargaining" act, but rather was a "hybrid" act containing some features of both kinds

of labor relations acts. 28 Kan. L. Rev. at 283. Goetz specifically discussed the legislature's attempt in 1976 to clarify the nature of PEERA. He argued that such an attempt suggested that PEERA, as enacted, should not be construed as consistent with the proposed "meet and confer" amendments. 28 Kan. L. Rev. at 284.

One specific ambiguity in PEERA identified by Professor Goetz was "an apparent conflict between the statutory obligation of the public employer to meet and confer in good faith on conditions of employment and the existing statutes and administrative regulations governing many of these same subjects." 28 Kan. L. Rev. at 284.

In 1983, we decided *Pittsburg State*, 233 Kan. 801, involving a dispute between the PSU faculty and the Board of Regents. In *Pittsburg State* we discussed in detail the nature of PEERA, drawing from Professor Goetz's work and concurring with his conclusion that PEERA is a "hybrid" act. 233 Kan. at 804. We reviewed PERB's interpretation of PEERA, which stretched the scope of "mandatory" subjects of bargaining beyond the specifically enumerated "conditions of employment" in K.S.A. 75-4322(t). We found PERB's balancing test for mandatory negotiability to be a reasonable interpretation. 233 Kan. at 816, 821. We further held that the Board of Regents was the "ultimate authority" and, thus, the "public employer" of the university faculty for purposes of PEERA. 233 Kan. at 812. Justice McFarland noted in her dissenting opinion that *Pittsburg State* involved unclassified employees. She questioned whether the majority would apply the same reasoning to a case "where classified employees are concerned and thereby let PERB override the Civil Service Board which is statutorily charged with complete control in its field?" 233 Kan. at 844 (McFarland, J., dissenting). The case at bar is a classified employee case.

The legislature responded to *Pittsburg State* by appointing a 1984 interim study committee charged with reviewing the effect of PEERA on the operation of state government and the "impact on that law of [*Pittsburg State*]." Proposal 30, Employer-Employee Relations Act, Report on Kansas Legislative Interim Stud-

ies to the 1985 Kansas Legislature 429. The Special Committee on Labor and Industry reported to the 1985 Legislature and, as in 1976, recommended amending PEERA to "clarify that the existing law is a meet and confer act." Proposal No. 30, p. 436. The committee's proposed amendments were introduced as H.B. 2013. H.B. 2013 would have amended the definition of "conditions of employment" in K.S.A. 75-4322(t) and the permissible scope of a PEERA memorandum of agreement in 75-4330(a) to exclude "any matter fixed or governed by the Kansas civil service act . . . or any personnel rules and regulations adopted by the secretary of administration." H.B. 2013, as amended, at 19. Like its 1976 cousin, H.B. 2013 died before reaching the floor for a vote.

The version of PEERA we review in the case at bar is virtually identical to the legislation reviewed in *Pittsburg State*. The only amendments since 1983 have been technical in nature.

We have found nothing in the legislative history surrounding the enactment of PEERA which specifically discusses the potential conflict between civil service regulations and provisions in a employee-employer memorandum of agreement. However, the legislature has twice appointed special committees to study the law and recommend changes. Legislation was introduced in 1976 and 1985 which attempted to alter the "hybrid" nature of PEERA and turn it into a pure "meet and confer" law. The proposed legislation would have specifically amended provisions to make clear that nothing in a memorandum of agreement could vary, contradict, or take precedence over a civil service regulation. The proposed legislation has not been adopted.

Since 1983, *Pittsburg State* has furnished explicit authority that PEERA is a hybrid act, resembling both a "meet and confer" law and a "collective bargaining" law. The legislature has had opportunities to pursue the recommendations of the special interim committees appointed in 1976 and 1985, and it has declined to do so.

Although inferences from legislative *inaction* are less certain than inferences from legislative action, we infer that the unsuccessful proposals of 1976 and 1985 were attempts to *change* the

law from how it was enacted, rather than attempts to clarify the statutes. Since PEERA exists substantially in the same condition as it did both in 1976 and 1985, we reason that the legislative history supports construing PEERA as creating an exception to the Civil Service Act and the regulations issued thereunder. PEERA was enacted after the Civil Service Act. The legislature did not indicate that agreements reached under PEERA would be subordinate to civil service regulations and subject to unilateral changes at the discretion of the Secretary of Administration.

The KDA admits its savings clause would allow its regulations "to control the conditions of employment if the terms of the memorandum of agreement are in conflict with the terms of the statute or regulation." The parties agree the savings clause would permit the KDA to unilaterally enact personnel regulations for all classified employees which would preempt any contrary provisions in a memorandum of agreement covering a particular group of classified employees.

A review of the KDA's contentions advanced before us and in the proceedings below shows that the KDA makes alternative arguments. First, it contends that the savings clause is a mandatory subject of bargaining and, therefore, the KDA was justified in withholding approval of agreements based on that subject, alone. Second, the KDA argues that the legislature *intends* for civil service regulations to preempt conflicting terms in PEERA agreements.

Independent of the question of mandatory negotiability, the case at bar raises a question of legislative intent. What are the relative positions of KDA regulations issued under the Civil Service Act and the statutory right of public employees under PEERA to organize, negotiate, and enter agreements covering the same subjects? If legislative intent favors civil service regulations over PEERA agreements, then the KDA's savings clause is of no consequence because its purpose is already achieved by statute. If the legislature intends, however, that PEERA agreements stand apart from civil service regulations, at least with respect to conflicting terms on the same condition of employment, then the KDA's savings clause is contrary to, and thus preempted by, state law. See K.S.A. 75-4330(a)(1).

The legislative intent issue requires us to examine PEERA and the Civil Service Act together. The parties have argued about the inherent potential conflict between Civil Service Act regulations and PEERA agreements. The KDA devotes nine pages of its brief to the interaction between PEERA and the Civil Service Act. Nevertheless, counsel for PERB suggested that "melding" the civil service laws with PEERA should be left to future cases. He noted, accurately, that neither the decision of the PERB presiding officer nor the decision of the district court addressed head-on the interplay between the Civil Service Act and PEERA.

Interestingly, however, PERB's counsel, who would like us to limit our focus to the mandatory negotiability question, argued that the savings clause cannot be mandatory because it would result in a "de facto repeal" of PEERA. On the other side, the KDA asks rhetorically in its reply brief, "Did the Legislature intend to repeal the Civil Service Act by enacting PEERA?" Those conflicting assertions highlight the fact that what lies at the crux of this case is an apparent conflict between PEERA and the KDA's civil service regulations. Resolution of the mandatory-permissive issue is joined to the resolution of the PEERA-KDA conflict. Initially, however, we address and reject the KDA's argument concerning mandatory negotiability.

## Mandatory Negotiability

· The district court looked only at the "mandatory" or "permissive" question and, upon resolving it, concluded that the remaining issues were irrelevant.

The KDA contends that the savings clause is mandatorily negotiable under the balancing test announced in *Pittsburg State*. It argues that PERB misapplied the balancing test and suggests that if the test is applied correctly, the savings clause emerges as a mandatory subject of bargaining. If the savings clause is a mandatory subject of bargaining, the KDA reasons, it was justified in withholding approval of the agreements based on the savings clause alone.

The KDA's contention is not well taken. The contention manipulates the words that have been used to describe mandatory

subjects of bargaining without considering the purpose and function of mandatory negotiability under PEERA. The result is, as the district court concluded, an argument that "does not make sense."

PEERA makes negotiating over conditions of employment mandatory. K.S.A. 75-4327(b) provides:

"Where an employee organization has been certified by the board as representing a majority of the employees in an appropriate unit, or recognized formally by the public employer pursuant to the provisions of this act, *the appropriate employer shall meet and confer in good faith with such employee organization in the determination of conditions of employment* of the public employees as provided in this act, and *may enter into a memorandum of agreement* with such recognized employee organization." (Emphasis added.)

PEERA imposes no obligation on the employer to agree to the employees' demands. However, PEERA *prevents* public employers that come under its provisions from simply acting unilaterally in determining conditions of employment. Although the governing body of the public employer ultimately can dictate any mandatory subject of bargaining, it can do so *only* after the public employer has negotiated in good faith, reached impasse in good faith, and participated in impasse-resolution procedures such as fact-finding and mediation. See K.S.A. 75-4332.

In *Pittsburg State*, we upheld PERB's interpretation that the list of conditions of employment in K.S.A. 75-4322(t) was not an exclusive list of the topics over which employees had a right to bargain. Other topics could come within the definition if they were *"significantly related* to an express condition of employment, and if negotiating the item will not unduly interfere with management rights reserved to the employer by law." 233 Kan. at 816.

The KDA concedes by implication that its savings clause cannot, itself, be characterized as a condition of employment for public employees. The savings clause, in our view, is not "significantly related"—that is, *related in kind*—to any *express* condition of employment listed under K.S.A. 75-4322(t). The KDA correctly explains that its "savings clause provides a procedure for establishing conditions of employment."

The KDA's position misconstrues the nature and purpose of the *Pittsburg State* balancing test for mandatory negotiability. The balancing test was employed because PERB determined that the list of conditions of employment in K.S.A. 75-4322(t) was not exhaustive. Consequently, more subjects than those expressly listed could be considered mandatory subjects of bargaining. The scope of the employees' rights and the employer's obligation to bargain was expanded beyond the express terms of 75-4322(t).

The KDA candidly admits that the "savings clause allows Administration to exercise the duties conferred upon it by the Kansas Civil Service Act without first meeting and conferring . . . . [It thereby] allows the State to maintain an efficient system with uniform conditions of employment for **all** classified employees." The KDA misconstrues the nature of the mandatory negotiability balancing test. In characterizing its savings clause as providing a "procedure for establishing conditions of employment listed in 75-4322(t)," the KDA neglects the procedure already established by PEERA—meeting and conferring in good faith. The savings clause is not a mandatorily negotiable item.

### Conflict Between the Civil Service Act and PEERA

K.S.A. 75-4327(b) of PEERA, as noted above, requires public employers who come within its provisions to "meet and confer in good faith . . . in the determination of conditions of employment." The employer has no obligation to agree. The employer must, however, "endeavor to reach agreement." K.S.A. 75-4322(m). The failure of a public employer to meet and confer in good faith is a prohibited practice under K.S.A. 75-4333(b)(5).

K.S.A. 75-3746(h) and K.S.A. 1994 Supp. 75-3747(a)(1), meanwhile, provide direct authority for the Secretary of Administration, upon recommendations from the director of personnel services, to adopt rules and regulations to carry out the provisions of the Civil Service Act. Express statutory authority allows the Secretary to issue regulations on "hours of work and other conditions of employment." See K.S.A. 75-3746(h). Acting under this authority, the Secretary has published regulations covering many of the same conditions of employment as those expressly made nego-

tiable in PEERA by K.S.A. 75-4322(t). See K.A.R. 1-9-1 through 1-9-22 (regulations for hours of work; holidays; vacation, sick, and injury leave; jury duty; etc.).

The conflict between collective negotiability and civil service regulation of the same conditions of employment arises in many jurisdictions that have both a public employer-employee relations law and civil service statutes. Two other states, Florida and Wisconsin, were mentioned by the parties during proceedings below. Both of those states' public employer-employee relations statutes *expressly* provide that terms in negotiated agreements supersede and take precedence over civil service statutes and regulations. See Fla. Stat. § 447.601 (1993); Wis. Stat. § 111.93(3) (1992). New Jersey, to the contrary, has expressly provided that civil service regulations predominate. See N.J. Stat. Ann. § 34:13A-5.3 (1988). "In most jurisdictions, however, there is no statute which resolves the issue of predominance and it has been left to the courts to resolve the conflicts which arise between collective agreement and the civil service law." 1 Werne, The Law and Practice of Public Employment Labor Relations § 3.2, p. 47 (1974). PEERA contains no explicit provision addressing the relationship between civil service regulations and conflicting terms in a memorandum of agreement.

PERB's presiding officer quoted and concurred with the following statement from a previous PERB order:

"[I]t seems unthinkable that the Kansas legislature would have gone to the trouble [of] establishing the Public Employer-Employee Relations Act, with its detailed procedures for recognition of employee representatives, meet and confer, impasse, and resolving prohibited practices, and would then have provided that the existence of a statute or regulation would automatically preclude the negotiability of all items, even mandatorily negotiable subjects, within the scope of PEERA."

"It is a fundamental rule of statutory construction to which all others are subordinate that the intent of the legislature governs when that intent can be ascertained." *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 1, 829 P.2d 561 (1992). Therefore, we must decide, based on statutory text, legislative history, and any other credible evidence of legislative intent, what influence, if any, the

legislature intends for civil service regulations to have on conflicting terms in PEERA agreements, or vice versa.

## Statutory Text

The KDA contends K.S.A. 75-4322(t) and K.S.A. 75-4330(a)(1) operate to "pre-empt any provision of a memorandum of agreement which is inconsistent with the [KDA] regulations." After listing examples of conditions of employment, K.S.A. 75-4322(t) states: "but nothing in this act shall authorize the adjustment or change of such matters which have been *fixed by statute or by the constitution* of this state." (Emphasis added.) K.S.A. 75-4330(a) provides: "The scope of a memorandum of agreement may extend to all matters relating to conditions of employment, except proposals relating to (1) any subject preempted by federal or *state law* . . . ." (Emphasis added.)

Apparently recognizing that neither K.S.A. 75-4322(t) nor K.S.A. 75-4330(a) refers to "regulations," the KDA attempts to fill that gap by relying on the rule that duly enacted and published administrative regulations are given the force and effect of law. See *J. G. Masonry, Inc. v. Department of Revenue*, 235 Kan. 497, 500, 680 P.2d 291 (1984). That rule does not apply to the issue before us. The issue is not what force and effect the civil service regulations are entitled to in isolation, but how the legislature intended to reconcile a conflict between such regulations and another body of statutory law. Administrative regulations do not supplant statutory law. *In re Tax Appeal of Chief Industries, Inc.*, 255 Kan. 640, 650, 875 P.2d 278 (1994).

K.S.A. 75-4322(t) and K.S.A. 75-4330(a) support the conclusion that the legislature intended PEERA agreements to operate independently of civil service regulations where the two conflict. Particularly significant is 75-4322(t). The legislature lists specific subjects over which it requires good faith negotiation. It then adds, nothing "shall authorize the adjustment or change of such matters which have been fixed by *statute or by the constitution*." (Emphasis added.) K.S.A. 75-4322(t). Rather than simply using the general term, "state law," as it did in 75-4330(a), the legislature specifically identified two sources of state law and omitted

a third, administrative regulations. Under the well-established maxim of statutory construction, *expressio unius est exclusio alterius*, when legislative intent is in question, we can presume that when the legislature expressly includes specific terms, it intends to exclude any items not expressly included in the specific list. See *State v. Wood*, 231 Kan. 699, 701, 647 P.2d 1327 (1982); *In re Olander*, 213 Kan. 282, 285, 515 P.2d 1211 (1973). Accordingly, K.S.A. 75-4322(t) suggests that the legislature envisioned conflicts between PEERA agreements and administrative regulations as a natural and permissible consequence of enacting PEERA and purposefully declined to give civil service regulations preemptive force.

Similarly, K.S.A. 75-4330(a) provides little help to the KDA. K.S.A. 75-4330(a) says that a memorandum of agreement "may extend to all matters relating to conditions of employment," thus referencing K.S.A. 75-4322(t). The legislature then excludes from the scope of PEERA agreements "any subject preempted by federal or state law." K.S.A. 75-4330(a)(1). This exclusion does not identify which federal and state laws preempt certain subjects in PEERA agreements. This provision supports the KDA's position only if we conclude that civil service regulations were intended by the legislature to preempt conflicting provisions in PEERA agreements. Standing alone, 75-4330(a) provides no indication on that question of legislative intent.

K.S.A. 75-4330(c) states:

"Any part or parts of a memorandum of agreement which relate to a matter which can be implemented by *amendment of rules and regulations of the secretary of administration* or by amendment of the pay plan and pay schedules of the state may be approved or rejected by the state finance council, and if approved, shall thereupon be implemented by it to become effective at such time or times as it specifies." (Emphasis added.)

This provision suggests that a PEERA agreement, upon approval by the state finance council, may require a change in administrative regulations, rather than vice versa.

The combined effect of several related provisions in PEERA suggests that the legislature envisioned PEERA agreements covering conditions of employment to be independent of, or take precedence over, conflicting civil service regulations.

K.S.A. 75-2925, the statement of purpose of the Civil Service Act, expresses a spirit of fairness and equality. The goal of uniformity has not been expressly mandated by the legislature. KDA has derived from 75-2925 its admirable goal of uniformity, which is expressed in K.A.R. 1-1-1(c): "Positions essentially alike shall be treated in a uniform manner in all personnel processes, and positions not so alike shall be treated with appropriate recognition of the nature and extent of the differences between them."

The legislature declared the policy and objectives behind PEERA in K.S.A. 75-4321, which was quoted substantially in full in *Pittsburg State*, 233 Kan. at 803.

The legislative statement on which the KDA relies in asserting the predominance of the civil service regulations is K.S.A. 75-4321(a)(4):

"[T]here neither is, nor can be, an analogy of statuses between public employees and private employees, in fact or law, because of inherent differences in the employment relationship arising out of the unique fact that the public employer was established by and is run for the benefit of all the people and its authority derives not from contract nor the profit motive inherent in the principle of free private enterprise, but from the constitution, statutes, civil service rules, regulations and resolutions."

K.S.A. 75-4321(a)(4) is the only express reference in PEERA to civil service regulations, and the statute does not endorse the concept that civil service regulations must preempt conflicting provisions in a PEERA memorandum of agreement.

The purpose of enacting PEERA is to give organized classified employees a specific but limited right to negotiate with their employer over conditions of employment. The purpose would be frustrated: (1) by requiring agreements reached between the employees and employer to meet the KDA's strict standard of uniformity for all similarly classified employees across the state and (2) by giving the KDA unilateral power to effectively modify such agreements to ensure such uniformity.

### Additional Issues Raised by KDA

The KDA raises two issues challenging PERB's conclusions as to whether a prohibited practice under K.S.A. 75-4333(b) was committed: (1) whether the KDA is the "public employer" for

classified employees at regents' institutions and (2) whether PERB must make an express finding that a prohibited practice was "willfully" committed. We have concluded that the KDA had no right to insist upon the savings clause. That is the only action complained of in this case, and our conclusion, in our view, ends the only real controversy squarely presented. Thus, we express no opinion on either question but leave them for another day and another case in which they must necessarily be decided.

The KDA contends that both questions are relevant to whether a prohibited practice has been committed and that the prohibited practice question determines the existence and scope of PERB's statutory authority to fashion remedies. See K.S.A. 75-4334(b). In this case, having determined that the KDA could not insist on the savings clause, and in view of the fact that an agreement had been reached at KSU and an agreement was all but reached at PSU—pending resolution of the savings clause dispute—PERB simply ordered the parties to allow the agreements to be implemented as negotiated. The only dispute—whether the savings clause could be forced into the agreement by the KDA—had been resolved. We hold under these circumstances that PERB acted within its authority to "effectuate the purposes and provisions" of PEERA. See K.S.A. 75-4323(d)(3).

We conclude that: (1) the savings clause is not a mandatory subject of bargaining; (2) the legislature intends that PEERA agreements on specific conditions of employment are not to be preempted by civil service regulations; (3) the questions of whether the KDA is the "public employer" and whether PERB must expressly find a prohibited practice to have been "willfully" committed are not necessary to the resolution of the present controversy; and (4) PERB, under the facts of this case, did not exceed its statutory jurisdiction in fashioning remedies.

We modify PERB's order by making no determination as to the KDA's public employer status and by viewing as moot under these circumstances the question of whether a prohibited practice was committed.

Affirmed as modified.