No. 73,250

NATIONAL COUNCIL ON COMPENSATION INSURANCE, A Florida Not-For-Profit Corporation, *Appellee*, v. RON TODD, COMMISSIONER OF INSURANCE OF THE STATE OF KANSAS, *Appellant*.

(905 P.2d 114)

Opinion filed November 3, 1995.

*Brian J. Moline,* special assistant attorney general, argued the cause and was on the brief for the appellant.

*Wyatt A. Hoch,* of Foulston & Siefkin, L.L.P., of Wichita, argued the cause, and *James L. Grimes, Jr.,* of the same firm, was with him on the brief for the appellee.

*William A. Larson,* of Gehrt & Roberts, Chartered, of Topeka, was on the brief for *amici curiae* the Kansas Association of Insurance Agents and the Independent Insurance Agents of America, Inc.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the Kansas Insurance Department (KID). The trial court held that K.A.R. 40-3-50, a regulation promulgated by KID, exceeded the statutory authority of K.S.A. 40-1117, which KID relied on in promulgating the regulation. The trial court also found the regulation constituted a public taking without just compensation, thereby violating the 5th and 14th Amendments of the United States Constitution.

The regulation in question was adopted by KID at the request of the Kansas Association of Insurance Agents. The regulation has the practical effect of shifting part of the cost of insurance agents doing business from the insurance agents to *all* workers compensation insurance purchasers in this state.

The appellee, the National Council on Compensation Insurance (NCCI), is a free-standing, not-for-profit corporation which is totally owned by 700 member insurance carriers. NCCI is in the business of developing workers compensation premium rates which are used throughout the United States by insurance companies marketing workers compensation insurance.

NCCI develops premium rates for approximately 225 insurers in Kansas who write workers compensation insurance. It is the only licensed rating organization in Kansas which develops workers compensation insurance rates. NCCI develops these rates by gathering figures from the employer-insured and setting exposure factors. At the time of this lawsuit, NCCI provided two sets of worksheets to member insurance carriers upon request at no charge and instructed the carrier to furnish one copy to the insured. Cur-

rently, NCCI sends a worksheet directly to the insured on an annual basis at no charge.

Insureds and independent insurance agents utilize the worksheets for various reasons. When an insured attempts to buy workers compensation insurance, its agent submits a worksheet to an insurance carrier. The carrier uses the worksheet to determine if it will offer a workers compensation quote to the employer. Moreover, insureds and agents utilize the worksheets to determine that NCCI and the insurance carrier calculated an accurate premium.

K.S.A. 40-1117 requires rating organizations such as NCCI to provide insureds and their agents direct access to the worksheets upon request. K.S.A. 40-1117 states in pertinent part:

"Every rating organization and every insurer which makes its own rates shall, within a reasonable time after receiving written request therefor, furnish to any insured affected by a rate made by it, or to the authorized representative of such insured, all pertinent information as to such rate. Every rating organization and every insurer which makes its own rates shall provide within this state reasonable means whereby any person aggrieved by the application of its rating system may be heard, in person or by authorized representative, on written request to review the manner in which such rating system has been applied in connection with the insurance afforded such person."

In complying with the statute, NCCI incurs a regular and repeated cost every time it retrieves, copies, and mails a worksheet. The persons requesting the worksheets, thereby incurring the distribution cost, are either insurance agents who need the worksheet information to attract new clients or insureds and their agents who need to replace misplaced worksheets. Through an assessment, the insurance carriers compensate NCCI for the initial worksheets. However, the insurance carriers do not compensate NCCI to retrieve, copy, and mail out a worksheet every time an insured or agent requests one. Thus, to recover its distribution costs, NCCI has charged a distribution fee to requesting insureds or agents for at least 30 years. Initially, NCCI charged a fee of $5 to provide a copy of any type of worksheet to either an insured or its agent upon request. In February 1992, NCCI raised this fee to $7.50 per worksheet for insureds, $25 per worksheet for commercial insurance agents requesting a single state risk worksheet, and $50 per work-

sheet for a commercial insurance agent requesting an interstate risk worksheet.

KID states that it was not aware NCCI was charging a distribution fee until 1992. In response to the increased fee, and at the request of the independent insurance agents, KID proposed K.A.R. 40-3-50, which states:

"No rating organization or insurer shall impose any conditions or fees upon any insured or any authorized representative of such insured for information requested pursuant to K.S.A. 40-1117 that is specifically relevant to any experience modification factor which is used or may be used to determine an individual insured's workers compensation premium."

KID promulgated the regulation with the intent that NCCI should recover the worksheet distribution costs in the same manner the worksheet preparation costs are recovered—charge the insurance carriers for the cost and let them recover the cost from all insureds through premiums. KID based its statutory authority to promulgate K.A.R. 40-3-50 on K.S.A. 40-1117. The trial court found that K.A.R. 40-3-50 exceeded KID's statutory authority under K.S.A. 40-1117 and that the regulation was unconstitutional under the 5th and 14th amendments of the United States Constitution as a taking without just compensation. After the district court found the regulation was invalid, KID approved a proposal offered by NCCI in which NCCI agreed to send a worksheet directly to the insured-employer on an annual basis at no charge.

The standard of judicial review of an administrative agency action is defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. Specifically, the KJRA's scope of review is stated in K.S.A. 77-621(c):

"(c) The court shall grant relief only if it determines any one or more of the following:

(1) The agency action, or statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

(2) The agency has acted beyond the jurisdiction conferred by any provision of law;

. . . .

(4) The agency has erroneously interpreted or applied the law."

The court may review an administrative agency action (*e.g.*, promulgation of a regulation) as any other civil case would be reviewed. K.S.A. 77-623.

The determination of whether K.A.R. 40-3-50 violates the Constitution or exceeds the statutory authorization of K.S.A. 40-1117 requires statutory construction. Statutory construction is a question of law; thus, this court has unlimited appellate review of these issues. The Supreme Court is not obligated to give the district court decision any deference. See *Dillon Stores v. Lovelady*, 253 Kan. 274, 275, 855 P.2d 487 (1993).

However, this court should extend some deference to the agency's interpretation of the statute. A specialized agency interpreting a statute which it has the duty to implement should be granted deference if the agency's statutory interpretation is supported by a rational basis. See *State Dept. of Administration v. Public Employees Relations Bd.*, 257 Kan. 275, 281, 894 P.2d 777 (1995).

Yet, an agency's interpretation is not binding. If an agency is mistaken as to a question of law, the court has an obligation to cure the agency's action. *State Dept. of Administration v. Public Employees Relations Bd.*, 257 Kan. at 281; *Hixon v. Lario Enterprises, Inc.*, 257 Kan. 377, 379, 892 P.2d 507 (1995). The burden of proving an agency action is invalid is on the party challenging the action. K.S.A. 77-621(a)(1).

According to KID, the statute authorizing the passage of K.A.R. 40-3-50 is K.S.A. 40-1117, which states in pertinent part:

"Every rating organization and every insurer which makes its own rates shall, within a reasonable time after receiving written request therefor, furnish to any insured affected by a rate made by it, or to the authorized representative of such insured, all pertinent information as to such rate."

NCCI contends that K.A.R. 40-3-50 exceeds the statutory scope of this enabling statute. NCCI does not challenge the constitutionality of K.S.A. 40-1117. It understands the purpose of K.S.A. 40-1117 is to insure that insureds and agents have access to the worksheets in order to check their accuracy. Yet NCCI contends that K.A.R. 40-3-50 has nothing to do with providing access to the worksheets. Rather, NCCI argues that the goal of K.A.R. 40-3-50 is to shift the

agents' cost of doing business from the agents to all employers who purchase workers compensation insurance, thereby assisting the agents in writing more accounts and earning more money. Moreover, NCCI contends that K.S.A. 40-1117 implies NCCI may collect a reasonable fee for the distribution services it provides. Thus, a regulation which does not allow NCCI to collect "any condition or fee" for the distribution services it provides is beyond the scope of the statute.

NCCI points to the canon of statutory construction which states that statutes should not be interpreted in a manner which creates uncertainty, injustice, confusion, or unreasonable results if at all possible. See *Tobin Constr. Co. v. Kemp*, 239 Kan. 430, 436, 721 P.2d 278 (1986). NCCI compares this canon and the interpretation of K.S.A. 40-1117 to the statutory construction argument which KID used in *Todd v. Kelly*, 251 Kan. 512, 515-516, 837 P.2d 381 (1992). According to NCCI, KID was able to use this canon in *Todd* to defeat fairly clear statutory language. 251 Kan. at 515-16. NCCI contends that the canon is even more relevant in this case than it was in *Todd*.

In *Todd*, the statutory language, when read in isolation, clearly required a supersedeas bond in the full amount of the judgment. In rejecting that position, this court said:

"Before turning to the specific statutes which are the subject of the certified question, we pause to iterate certain basic rules of statutory construction:

'Interpretation of statutes is a question of law. The function of the court is to interpret the statutes, giving the statutes the effect intended by the legislature. *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 719, 792 P.2d 971 (1990).

'As a general rule, statutes are construed to avoid unreasonable results. *Wells v. Anderson*, 8 Kan. App. 2d 431, 659 P.2d 833, *rev. denied* 233 Kan. 1093 (1983). There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 7, 643 P.2d 168 (1982).' *City of Olathe v. Board of Zoning Appeals*, 10 Kan. App. 2d 218, 221, 696 P.2d 409 (1985).

'A construction of a statute should be avoided which would render the application of a statute impracticable or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance of an impossible act.' *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 8, 643 P.2d 168 (1982). See 73 Am. Jur. 2d, Statutes § 251.

'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.' *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989).

'[T]he court must give effect to the legislature's intent even though words, phrases or clauses at some place in the statute must be omitted or inserted." *Ross*, 245 Kan. at 594.

'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.' Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975). (Emphasis added.)

"We now turn to the issue raised by the certified question. We agree with the trial judge that K.S.A. 40-3422, when read in isolation, is clear and unambiguous and appears to require a supersedeas bond in the full amount of the judgment. However, as the foregoing rules and authorities clearly demonstrate, such a simplistic and narrow reading of the statute is not available to us. K.S.A. 40-3422 may not be read in isolation but may only be considered in connection with the other provisions of the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq*. (the Act).

"K.S.A. 40-3422 is one small part of the Act first enacted by the legislature in 1976. The Act has been amended and supplemented at nearly every session of the legislature since 1976 and is a comprehensive attempt by the legislature to address problems faced by Kansas health care providers and the public in the areas of medical malpractice insurance. Commissioner Todd, in his brief before this court, accurately summarizes the history and rationale for the adoption of the Act.

'The Act arose out of circumstances beginning in the early 1970s, during which insurers, who had previously underwritten medical malpractice insurance policies, abandoned the market in response to increasing claims and decreasing profits. As a result, health care providers found it increasingly difficult to obtain malpractice insurance.' *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 335, 757 P.2d 251 (1988). With the adoption of the Health Care Provider Insurance Availability Act, all Kansas doctors were guaranteed the availability of malpractice insurance. Unfortunately, the crisis of medical malpractice insurance affordability continued, and intensified. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. at 337. See also *Bair v. Peck*, 248 Kan. 824, 828, 811 P.2d 1176 (1991). This affordability crisis was aggravated by the financial woes of the Health Care Stabilization Fund, which necessitated a substantial increase in the Fund surcharge

which is assessed against Kansas health care providers. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. at 336.

'In response, the Kansas Legislature adopted a number of amendments to the Act during the 1984, 1985, and 1986 legislative sessions. Among these reforms were amendments to K.S.A. 1990 Supp. 40-3404, which were designed to place the Fund on an actuarially sound basis. Steps were also taken to reduce the Fund's 'limits' of liability, in an attempt to make coverage more affordable. Originally the Act had provided for unlimited liability by the Fund. This unlimited exposure made coverage too expensive, and also made it difficult to determine the appropriate Fund surcharge, based upon proper actuarial principles. Therefore, effective July 1, 1984, the legislature limited Fund liability to $3,000,000; in doing so, it was the clear intent of the legislature that Kansas physicians be assessed a Fund surcharge based upon a maximum exposure of $3,000,000.'

"In construing various sections of the Act, we have held that the entire act must be considered and that no one section should be read in isolation from the others, as the trial judge did in this case. For example, in *Bell v. Simon*, 246 Kan. 473, 790 P.2d 925 (1990), the Insurance Commissioner was contending, *inter alia*, there was no coverage by the Fund for Dr. Bazzano, a Missouri resident licensed to practice in Kansas, because of his failure to pay the required surcharge. The Commissioner sought a literal construction and application of K.S.A. 40-3403(c), arguing that the Fund had no liability if there was any violation of the Act. The court found that a rigid construction of the statute would be unreasonable and contrary to the overall objectives and purposes of the entire Act. In doing so, the court stated:

'K.S.A. 40-3403(c) must be read in harmony with the entire Act. While the legislature imposed more duties on the nonresident provider, nothing indicates the legislature envisioned less protection in the form of coverage or Fund liability when basic coverage continued by operation of law. While it may be true that Dr. Bazzano owes the Fund a surcharge for the period from April 1, 1986, through July 1987, the basic coverage continued by operation of law during this period, and we hold the excess liability coverage of the Fund also continued. To hold otherwise, by a narrow isolated construction of K.S.A. 40-3403(c), would negate the public policy behind the Act as to patients of nonresident providers even though there had been substantial compliance with the act.' 246 Kan. at 484.

"When the two statutes now under consideration are read together, the conflict recognized by the Tenth Circuit Court of Appeals is obvious. K.S.A. 1991 Supp. 40-3403(e) clearly states, 'In no event shall the fund be liable to pay in excess of $3,000,000 pursuant to any one judgment or settlement against any one health care provider.' K.S.A. 40-3422, on the other hand, states, '[T]he proceedings shall be stayed on appeal by the filing of a supersedeas bond in the full amount of the judgment.' Obviously the two statutes cannot both be literally applied when, as here, the judgment exceeds the statutory liability of the Fund. Therefore, we must determine, as best we can, the legislative intent of the two statutes when read in context with the entire Act." 251 Kan. at 515-18.

NCCI also cites to the canon which states that statutes which disrupt a person's right over his or her own property should be strictly construed. See *Babb v. Rose*, 156 Kan. 587, 589, 134 P.2d 655 (1943).

The district court agreed with NCCI's above-stated arguments and found the following:

"While K.S.A. 40-1117 does require that insurance rating information be furnished by rating organizations to insureds and their agents within a reasonable time, the statute cannot reasonably be read to require that such information be supplied at no cost whatsoever to the parties requesting it. To require, as K.A.R. 40-3-50 does, that a rating organization must bear all the costs associated with producing, locating and delivering copies of their rating information to any insured or agent who makes a request clearly places an unjust burden on the rating organization. Therefore, under this interpretation of K.S.A. 40-1117, it must be found that K.A.R. 40-3-50 in its present form does exceed the scope of statutory authority and is invalid."

KID contends that the district court misunderstood its argument. KID states that K.A.R. 40-3-50 does not require a rating organization to "bear all the costs associated with producing, locating and delivering copies of their rating information." Rather, K.A.R. 40-3-50 simply requires NCCI to collect the distribution costs from someone other than the insureds and agents, such as the insurance carriers. The insurance carriers may then recover these costs through premiums if they so choose. KID reasons it has made an agency determination that free distribution of the worksheets should be a part of the basic services which an insured is entitled to upon paying a premium. KID contends that this is an appropriate and valid agency determination. According to KID, the district court decided that the agency should not regulate the distribution costs through the premium rates, but rather should regulate the costs directly by prescribing the amount NCCI may charge as a distribution fee. Thus, the district court found the regulation was invalid. KID asserts that the district court incorrectly substituted its own judgment for that of the agency. NCCI argues that the court did not interfere with KID's regulatory power. Rather, the court struck down a regulation which exceeded the agency's statutory authority, and the court simply made a sugges-

tion in dicta of a regulation which would withstand constitutional muster.

We do not believe the trial judge misunderstood KID's argument. The trial judge clearly thought KID's argument was a smokescreen shrouding the fact that the regulation would cause the premiums of all workers compensation insureds to increase in order to cover the cost of agents attempting to attract new accounts. We recognize the regulation would benefit some insureds in that the regulation would allow more agents to examine the insured's worksheets and possibly obtain cheaper workers compensation insurance for the insured. However, the dispositive issue is the legislature's intent in adopting K.S.A. 40-1117.

Our reading of K.S.A. 40-1117 convinces a majority of this court that in adopting the statute the legislature intended that any insured or authorized agent receive all pertinent information as to the insured's rates and be afforded a reasonable opportunity to correct any errors in the worksheets affecting the insured's rates. We find no legislative intent that the rating organization be required to furnish the information to an unlimited number of agents wishing to solicit an insured's business and to pass that cost on to all persons purchasing workers compensation insurance in this state through increased workers compensation premiums.

Having decided the trial court correctly held that K.A.R. 40-3-50 exceeds the scope of K.S.A. 40-1117, the remaining issues are moot.

ALLEGRUCCI, J., not participating.

ROBERT H. MILLER, C.J. Retired, assigned.▌

DAVIS, J., dissenting: I respectfully disagree with the majority's decision inasmuch as it finds that K.A.R. 40-3-50 exceeds the scope of statutory authority granted to the Kansas Insurance Department (KID) by K.S.A. 40-1117. I would find that the regulation was within the power granted to KID by K.S.A. 40-1117.

K.S.A. 40-1117 mandates that a rating company provide to an insured information used in determining the insured's rate. K.A.R. 40-3-50 reflects a determination on the part of KID that the free

distribution of this rating information is a part of the basic service to which an insured is entitled simply by paying an insurance premium. I would find that this is a valid exercise of KID's authority under the Kansas Insurance Act.

The purpose of the Kansas Insurance Act is to "promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate and unfairly discriminatory and to authorize and regulate cooperation among insurers in rate making and other matters under the scope of this act." K.S.A. 40-1111. A necessary part of this regulation includes the ability of KID to determine what services should be included in the premium rates charged by insurance companies. See generally K.S.A. 40-1111 *et seq*. Absent such ability, an insurance company could escape regulation by simply reducing the services it provides as a part of the basic premium and charging additional costs for such services, even though the services should rightfully be a part of the basic insurance package.

K.A.R. 40-3-50 fulfills the basic purpose behind the Kansas Insurance Act, which is to regulate insurance rates so that they are not excessive, inadequate, or unfairly discriminatory. K.S.A. 40-1117 mandates that an insured be provided with information which affects the insured's rate. It is appropriate that the information be provided free of charge to ensure that such information be widely available to insureds. By requiring that the costs associated with providing this information be reflected in the costs of insurance premiums, the KID makes certain that these costs are subject to its review rather than completely unregulated.

The majority opinion recognizes that a specialized agency interpreting a statute which it has the duty to implement should be granted deference if the agency's statutory interpretation is supported by a rational basis. See *State Dept. of Administration v. Public Employees Relations Bd.*, 257 Kan. 275, 281, 894 P.2d 777 (1995). K.A.R. 40-3-50 has a rational basis, and I would find that it is a valid exercise of the authorization granted by K.S.A. 40-1117.

Once the question of whether K.A.R. 40-3-50 is a valid exercise of the authorization granted to KID is determined, the question of whether the regulation is constitutional is easily settled. While

NCCI argues that forcing it to provide worksheets to insureds and their agents free of charge represents a taking without compensation contrary to the 5th Amendment, it is clear that the regulation does not force NCCI to forego compensation for its services. Instead, the regulation merely requires NCCI to seek compensation from its insurance carriers rather than insureds and their agents. Thus, K.A.R. 40-3-50 is not a taking, as it does not diminish the value of NCCI's distribution services but simply dictates who NCCI can charge for distribution fees.

Because I believe that K.A.R. 40-3-50 is a valid exercise of regulatory authority and is not a taking of property without just compensation, I respectfully dissent from the majority's opinion.

SIX, J., joins in the foregoing dissent.