No. 70,346

J. MARK HIXON, SHAWNEE COUNTY APPRAISER, *Appellant*, v. LARIO ENTERPRISES, INC., *Appellee.*

(892 P.2d 507)

Opinion filed March 22, 1995.

*Sandra L. Jacquot*, assistant county counselor, argued the cause, and *Linda P. Jeffrey*, county counselor, was with her on the briefs for appellant.

*Robert J. O'Connor*, of Morrison & Hecker, of Wichita, argued the cause, and *Pamela Clancy*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: Lario Enterprises, Inc., (Lario) a Shawnee County developer, seeks review of a Court of Appeals decision holding

that the developer's discount method of valuing subdivision property for ad valorem tax purposes is unconstitutional and violative of the Kansas statutory scheme of valuation. We granted review because the issue is one of first impression in Kansas and because the issue involves significant tax valuation questions affecting Kansas developers and home buyers.

The Court of Appeals' opinion provides an excellent description of the developer's discount method of valuation for ad valorem tax purposes:

"The developer's discount method of valuation, which is also known as the subdivision approach or the development approach, consists of a discounted cash flow analysis which considers a projected absorption rate and the corresponding drop in income from the sale of lots. Inherent in this approach is the notion that, if the owner of multiple lots places them all on the market at once, there would not be enough buyers in the marketplace who would be willing to pay full market price for each lot. Such approach assumes that the seller would have to discount the price of the property to lure additional buyers into the market. The discount is calculated by utilizing an absorption factor, which based upon the number of willing buyers in any given year. In the alternative, the developer's discount method could be defined as the price that the owner of multiple lots would accept for all of its lots when sold to one buyer; that buyer would presumably pay a discounted price for each individual lot because the buyer would take the absorption factor into account in determining how quickly, and for what price, he or she could in turn sell the lots to other buyers." *Hixon v. Lario Enterprises Inc.*, 19 Kan. App. 2d 643, 647, 875 P.2d 297 (1994).

Before consideration of the undisputed facts in this case, the Board of Tax Appeals (BOTA) approved Lario's use of the developer's discount method of valuation, and the BOTA order was affirmed by the Shawnee County District Court. The Court of Appeals, however, reversed on constitutional and statutory grounds. We do not decide the constitutional question posed because the developer's discount method, as described in this opinion, violates the Kansas statutory scheme for valuing real property for ad valorem tax purposes. For the reasons stated in this opinion, we therefore affirm the decision of the Court of Appeals, as modified.

## STANDARD OF REVIEW

The question presented is one of law. BOTA is a specialized

agency that exists to decide issues concerning taxation and valuation; its decisions should be given great credence and deference when it is acting in its area of expertise. *In re Tax Appeal of Director of Property Valuation,* 14 Kan. App. 2d 348, 353, 791 P.2d 1338 (1989), *rev. denied* 246 Kan. 767 (1990). The ruling of an administrative agency on questions of law, while not as conclusive as its findings of facts, is nonetheless persuasive and may carry with it a strong presumption of correctness. *Boatright v. Kansas Racing Comm'n,* 251 Kan. 240, 246, 834 P.2d 368 (1992). However, if the reviewing court finds that the administrative body's interpretation of a question of law is erroneous as a matter of law, the court should take corrective steps. 251 Kan. at 246. The party challenging the validity of the agency's action bears the burden of proving the invalidity of the action. K.S.A. 77-621(a)(1).

## FACTS

This case concerns the 1989 property tax appraisal of the Montara and Montara North subdivisions. Montara and Montara North (collectively Montara) were constructed between 1958 and 1960. The units were originally occupied by members of the Air Force stationed at Forbes Field. After the air base closed in 1973, the property was purchased by the City of Topeka and used as low-income rental housing. Lario purchased the property in 1979.

As a subdivision, Montara consists of between 650 and 700 individual parcels of property. These parcels can generally be divided into five groups: Category 1 contains 117 vacant lots; category 2 is comprised of 386 single family rental units; category 3 is made up of 158 vacant single family residences which are in need of renovation and not habitable; category 4 consists of three model homes and offices used by the Montara staff; and category 5 is comprised of three vacant lots and an RV storage area.

Shawnee County (County) appraised all the properties at $18,099,240. Lario appealed to BOTA, claiming that the fair market value based on the developer's discount method of valuation was $9,600,000. BOTA, accepting the developer's discount method advanced by Lario, modified the appraised value to the amount of $12,028,600. BOTA accepted the County's appraisal

in category 4, and Lario has not appealed that determination. This appeal by the County involves categories 1, 2, 3, and 5 only.

In support of its contention before BOTA, Lario relied on the testimony of David Craig, an appraiser. He testified that he valued the 117 lots in category 1 as one parcel of land, using the developer's discount approach. He testified that he valued the property in category 2 as a single unit, using the direct capitalization approach, because the property's best use was characterized as rental property. Craig also testified that he used the developer's discount method to value the 158 vacant residences in Category 3. He valued the property in Category 5 as a single unit with no discount. According to Craig, buyers in the marketplace purchasing multiple lots will pay less per lot than if they were buying only one lot, and the developer's discount method takes this element into consideration. Craig concluded that the value of the entire property was $9,600,000, approximately one-half the County's valuation.

Lario called Dr. Mark Dotzour, a professor at Wichita State University, who testified that the developer's discount approach should be used in valuing Lario's subdivision property. According to Dr. Dotzour, a discount rate is essential in any valuation of a subdivision because a single owner could not sell all of the houses in a subdivision in a given year. Instead, the value of the property is discounted to reflect an absorption rate, *viz.*, the rate at which the parcels could be sold and the cost of holding the parcels until they are sold.

Rick Stuart, Deputy Appraiser for Shawnee County, testified on behalf of the County. Stuart did not originally use the developer's discount method but later used the discount method to value the vacant lots in category 1 after considering a memorandum from the Property Valuation Division of the Kansas Department of Revenue. Stuart, nevertheless, opined that the developer's discount method was not a proper method for valuing Montara. According to Stuart, the ad valorem tax statute is concerned with valuing each parcel of property on an annual date and, therefore, it is inappropriate to consider an absorption period to take into account the sale of properties years later.

BOTA approved Lario's use of the developer's discount method of appraisal and fixed the value of the property at $12,028,600. On appeal to the district court, the court concluded that the sole issue for review was whether the developer's discount method was a lawful technique for valuing unsold subdivision properties. The court stated that such a method was legitimate and had been approved by this court in *State Highway Commission v. Lee*, 207 Kan. 284, 485 P.2d 310 (1971). The court further found that the valuing of several parcels of property as one unit did not violate the uniformity requirement found in the Kansas Constitution. BOTA's order was upheld.

The Court of Appeals reversed, concluding that the developer's discount method violated the "uniform and equal basis of valuation" requirement in the Kansas Constitution. It reasoned that the developer's discount method focused strongly on the identity of the owner of the lot, treating investors with multiple lots differently than owners with one lot and treating an investor with multiple lots in one subdivision differently than an investor with multiple lots spread throughout the city. The Court of Appeals noted that K.S.A. 1994 Supp. 79-501 states that each parcel of real property shall be appraised at its fair market value and that the appraisal should be made as if each parcel is sold on the appraisal date.

## STATUTORY SCHEME

Pursuant to the Kansas Constitution, the State is directed to establish a system of valuating property that insures property will be valued in a uniform and equal manner. Kan. Const. art. 11, § 1. Consistent with constitutional dictates, the legislature has provided for a uniform and equal basis of valuation and taxation. K.S.A. 1994 Supp. 79-1439(a) provides that "[a]ll real and tangible personal property which is subject to general ad valorem taxation shall be appraised uniformly and equally as to class and, unless otherwise specified herein, shall be appraised at its fair market value, as defined in K.S.A. 79-503a, and amendments thereto." K.S.A. 1994 Supp. 79-501 provides that each parcel of real property shall be appraised at its fair market value in money.

Fair market value is defined by K.S.A. 1994 Supp. 79-503a:

" 'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

. . . .

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

(a) The proper classification of lands and improvements;

(b) the size thereof;

(c) the effect of location on value;

(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

(e) cost of reproduction of improvements;

(f) productivity;

(g) earning capacity as indicated by lease price or by capitalization of net income;

(h) rental or reasonable rental values;

(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

(j) restrictions imposed upon the use of real estate by local governing bodies, including zoning and planning boards or commissions; and

(k) comparison with values of other property of known or recognized values. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes.

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law."

In determining the validity of a tax assessment of real property, the essential question is whether the mandates of 79-503a have been considered and applied. See *Northern Natural Gas Co. v. Williams*, 208 Kan. 407, Syl. ¶ 7, 493 P.2d 568, *cert. denied* 406 U.S. 967 (1972). The question before us involves the interpretation of the Kansas statutory scheme for valuing real estate for ad valorem purposes. Because it is a question of law, the final construction rests with courts. *National Collegiate Realty Corp. v. Board of Johnson County Comm'rs*, 236 Kan. 394, 404, 690 P.2d 1366 (1984).

K.S.A. 1994 Supp. 79-501 states that "[e]ach *parcel* of real property shall be appraised at its fair market value in money." (Emphasis added.) The "fair market value" of each *parcel* is determined by using the factors outlined in 79-503a. Appraising all the parcels owned by Lario and discounting them, by either the developmental approach or a discounted cash flow method, controverts the plain language of the statute. The law requires that fair market value be based on the valuation of the property owned, not the status of the owner of the property and the number of lots owned. This is not to say that each parcel in a given tract must be valued using the same method of valuation. However, the method of valuation should be tied to factors associated with each parcel of property, not the status of the owner of the property.

The district court concluded that *State Highway Commission v. Lee*, 207 Kan. 284, and *Great Northern Ry. v. Weeks*, 297 U.S. 135, 80 L. Ed. 532, 56 S. Ct. 426 (1936), support the use of the developer's discount approach to tax appraisal. In *Lee*, the Kansas Supreme Court ruled that it was appropriate to use the development approach to value a tract of land for condemnation purposes. In *Weeks*, the United States Supreme Court held that "[t]he principles governing the ascertainment of value for the purposes of taxation, are the same as those that control in condemnation cases." 297 U.S. at 139.

While we recognized in *Lee* that the development method of valuation was a derivative of the income method of valuation specifically suited to developers, *Lee* involved unplatted raw ground that was slated for development. In *Lee*, we concluded that where there was evidence that subdivision was imminent, and where there would be no comparable sales of land that had been planned for development in the market area, it was appropriate to consider the value of land if developed, taking into account the cost to develop that land. In the present case, we deal with Montara, which has already been platted and where street and utilities are in place. The fair market value for a lot in the subdivision already incorporates the cost of subdivision and the holding cost. Moreover, in this case, there exist comparable sales of land which may

be taken into account in determining the fair market value of the property. The dispute in *Lee* was between valuing the land as raw, unimproved farm ground versus valuing it as a subdivision. Here, the land is not raw unimproved farm ground but is, in fact, a subdivision. We conclude that *Lee* is not applicable because in this case the land is developed and the owner of the subdivision is simply holding the lots for resale.

Lario also relies on several memoranda of the Kansas Department of Revenue, Division of Property Valuation, which he claims approved the use of the developer's discount approach to appraisal. In its opinion, the Court of Appeals sets forth two relevant memoranda and concludes that the memoranda referred to do not approve the use of the developer's discount method in this case. We agree with the Court of Appeals and quote from that portion of the opinion dealing with the memoranda in question:

"In its brief, Lario relies heavily on several memoranda of the Kansas Department of Revenue, Division of Property Valuation (DPV), which approve the use of the developer's discount approach to appraisal. A DPV memorandum dated January 5, 1989, provides as follows:

'We have received several inquiries and requests for clarification of subdivision development appraisal procedures. Although mapping specifications call for the creation of individual parcels *when a subdivision plat is filed*, the appraisal should actually reflect the aggregate value of the development.

'The appraiser must consider the rate at which a project will be completed and the number of vacant lots expected to be sold in the local market each year. This absorption period for typical subdivisions covers several years. To account for the impact of this projection on value, a factor reflecting the discount rate should be estimated by ascertaining the appropriate risk rate in the marketplace. This factor is then applied to the expected net proceeds from lot sales over the completion/absorption period to arrive at the present value of the land. *When a newly-platted subdivision has been mapped*, an influence factor can be applied to each lot or a unique neighborhood CALP model can be developed to accomplish this adjustment. [Emphasis added.]

A DPV memorandum dated February 16, 1990, provides:

'Although K.S.A. 79-405 requires platted lots in a subdivision to be identified and taxed individually, the appraisal should be based upon the entire tract of land. When the appraisal of the whole tract is complete, the market value shall then be allocated among the developer's individual lots. This requires the county appraiser to distinguish between the gross sellout (aggregate of individual retail

prices) and the wholesale value of the development as one unit, which is market value.

'This conclusion reconfirms the Division's position with respect to the subdivision valuation issue addressed in the Director's update #26 dated January 5, 1989. County appraisers have been directed to use the development approach when comparable sales data (for entire subdivisions) is limited. You are expected to obtain pertinent income and expense data from developers and prepare an estimate of value based on the present worth of the projected stream of net income.

'The use of discounted cash flow models have gained wide acceptance in the valuation of this type of investment property over the last few years. The subcommittee strongly recommends the use of a detailed cash flow analysis which itemizes the entire income and expense flow on a year by year basis during the absorption period. In selecting the discount rate, the appraiser shall consider the desirability of the project, the risk involved and the competitive rate of return required to attract capital to the project. This methodology shall be given serious consideration at the formal conference with any developer who has filed a 1989 tax payment under protest. . . .

'A related issue, brought up by appraisers, concerns the impact of individual subdivision lot sales on the ratio study. These parcels may often sell for two or three times their allocated value when purchased on an individual basis. This is no cause for alarm because the comparison is not appropriate. The subject of the appraisal is a group of lots and the allocated per parcel value is simply an administrative requirement. A sale of one lot from a developer's holding is very similar to a split which takes place from an acreage tract. The only difference is that the appraiser has some prior knowledge of how the "splits" will likely occur in a subdivision from the recorded plat. Although the sale data will be very useful for arriving at individual lot values it will not be used in the official state assessment/sales ratio study.'

"We conclude that Lario's reliance on these memoranda is misplaced. It is clear that the January 5, 1989, memorandum refers to the valuation of a planned subdivision, not a completed one. The memorandum speaks of valuing subdivision parcels 'when a subdivision plat is filed' and 'the rate at which a project will be completed.' In other words, the memorandum approves use of the developer's discount method to appraise parcels when the plat has been filed, but development, *i. e.*, installing roads and utilities has not been accomplished. The memorandum does not approve use of the developer's discount method when the plat has been filed, streets and curbs have been laid, utilities have been installed, and homes have been built." 19 Kan. App. 2d at 649-51.

Several other states have considered and rejected the developer's discount method of valuation when dealing with subdivided property, where streets and curbs have been laid, utilities have been installed, and homes have been built on the property. In

*First Interstate Bank v. Dept. of Rev.*, 306 Or. 450, 455, 760 P.2d 880 (1988), the Oregon Supreme Court found that the developer's discount method was not a permissible method of valuation for an established subdivision. The court noted that the developer's discount method does not assess the value of the properties when put to their highest and best use but instead, reduces their value to the value they would have if considered as an investment. 306 Or. at 454-55. While the court stated that the developer's discount method could be an appropriate method for valuing underdeveloped property, it held that "[t]he value of each lot by itself, not as a portion of a larger piece of property, must be assessed" for developed subdivisions. 306 Or. at 453.

The Michigan Supreme Court also rejected the use of the developer's discount method in *Rose Bldg. Co. v. Independence Twp.*, 436 Mich. 620, 462 N.W.2d 325 (1990). The court found that although the developer's discount method might be appropriate for raw or unimproved land, the uniformity requirement of the Michigan Constitution compels the assignment of values to property upon the basis of the true cash value of the property and not on the manner in which it is held. 436 Mich. at 640. The court stated that ownership is not a germane consideration when determining value. 436 Mich. at 640.

Likewise, in *St. Leonard Shores Joint Ven. v. Supervisor*, 307 Md. 441, 445-46, 514 A.2d 1215 (1986), the Maryland Court of Appeals rejected the developer's discount method. The court held that it was inappropriate to provide any sort of discount for the time necessary to sell all the lots in a subdivision. The court stated: "Regardless of whether a buyer for each lot actually exists, the assessor is required to assess each lot as if a willing buyer exists." 307 Md. at 446.

In a case not cited by the parties, *E. Arapahoe Land v. Bd. of Assessment*, 805 P.2d 1170, 1173 (Colo. App. 1990), the Colorado Court of Appeals held that when establishing the value of vacant nonagricultural land, the county assessor was required to consider the absorption rate even if the property had not been subdivided. However, the applicable appraisal statute in Colorado specifically required assessing officers to consider the absorption rate for sub-

division development. See 805 P.2d at 1172. Kansas has no such requirement.

Kansas law requires that each "parcel" of property shall be appraised at its fair market value. K.S.A. 1994 Supp. 79-501. The fair market value of each parcel of property is the price that a well-informed buyer and seller would agree on in an open and competitive market for a sale occurring on January 1. K.S.A. 1994 Supp. 79-503a. The developer's discount method of valuation as applied in this case violates the Kansas statutory scheme of valuing property for ad valorem tax purposes.

The judgment of the Court of Appeals is affirmed as modified, the judgment of the district court is reversed, and the case is remanded to the district court with directions to remand to BOTA for further proceedings consistent with this opinion.