No. 77,212

IN THE MATTER OF THE APPLICATION OF AMERICAN RESTAURANT OPERATIONS, *et al.,* FOR RELIEF FROM A GRIEVANCE AND PROTESTS OF TAXES PAID IN SEDGWICK COUNTY, KANSAS.

(957 P.2d 473)

Opinion filed April 17, 1998.

*Clarence D. Holeman,* assistant county counselor, argued the cause and was on the brief for appellant Board of Sedgwick County Commissioners.

*Eric F. Melgren,* of Foulston & Seifkin, L.L.P., of Wichita, argued the cause, and *James D. Oliver,* of the same firm, was with him on the brief for appellees American Restaurant Operations, *et al.*

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the Board of Sedgwick County Commissioners (County) from a Sedgwick County District Court decision concerning a Kansas Board of Tax Appeals (BOTA) order. There are three issues in the appeal. The County claims that (1) it was error to give retrospective effect to an amendment to K.S.A. 79-1427a, which was enacted while the case was pending in the district court; (2) it was error for BOTA to reduce the taxpayer's penalties from 100% to 10% on the 1986, 1987, 1988, and 1989 assessments, and from 50% to 10% on the 1990 and 1991 assessments; and (3) it was error for the trial court to impose sanctions of $1,500 in attorney fees against the County for its failure to allow discovery.

The appellees/taxpayers will be referred to as taxpayer, although the relationship is complex. Appellee American Restaurant Operations merged with appellee Brazos Valley Restaurant in 1988 and owns several separate Grandy's franchise locations in Sedgwick County. Appellee Restaurant Management Company is a management company which manages the restaurants and charges a management fee. Restaurant Management Company does not own an interest in the restaurants.

The taxpayer had little, if any, expertise in-house to maintain personal property tax records or make personal property tax filings. The taxpayer hired the independent consulting firm of Savage, Savage & Brown (SSB) to do its personal property tax filings. Each year, the taxpayer sent its entire depreciation schedule to SSB so that its personal property renditions (listings) could be prepared

from it. A personal property tax rendition is a listing the taxpayer has to file every year to determine taxable personal property. The taxpayer did not maintain personal property tax records. SSB was responsible for maintaining those records for the taxpayer. For tax years 1986-1991, SSB signed and filed a rendition for each restaurant location, which was supposed to include every item of personal property located at each restaurant. The county appraiser's office valued the personal property listed on the rendition and sent SSB a tax bill based on these values. SSB forwarded this tax bill to the taxpayer, who paid it, no questions asked. Prior to April 1990, the taxpayer had no reason to believe or suspect that SSB's handling of these matters might not be correct.

The county appraiser challenged the renditions for 1985 through 1989. Sedgwick County employed a certified public accounting firm, Allen, Gibbs & Houlik (AGH), to assist the county appraiser in evaluating the taxpayer's personal property tax renditions. The county appraiser's office prepared a final figure of "escaped" assessment, and that figure was placed on the tax roll.

A considerable procedural history followed, none of which is of value in deciding this appeal until the point where the taxpayer filed an injunction action in the Sedgwick County District Court and an appeal with BOTA. Eventually, the parties agreed on the amount of escaped assessments that the taxpayer owed, and the tax rolls were corrected to reflect the correct amount. No dispute regarding the listing or valuation of the taxpayer's property remains.

However, the case continued in front of BOTA for it to decide issues regarding penalties, statute of limitations, and discovery sanctions. BOTA found that the taxpayer had established excusable neglect, which justified a substantial abatement of the mandatory statutory penalties for delinquent and escaped assessments. BOTA also found that the taxpayer's motion for costs in filing a motion to compel discovery should be granted in the amount of $1,500 and that the County's escaped assessment tax bill for 1986 was time barred under K.S.A. 79-1427a. The County disagreed with BOTA's ruling on the first two issues, and it filed a petition for judicial review in Sedgwick County District Court. The taxpayer filed a cross-petition in the same court. While the case was pending in

district court, the legislature enacted amendments to 79-1427a, which shortened the statute of limitations on the number of years a county can go back and collect escaped assessments from 4 years to 2 years. In its ruling, the trial court gave retrospective effect to these amendments, so that they barred the County's collection of escaped assessments for all years prior to 1990. The trial court also found that neither BOTA's abatement of the taxpayer's penalties nor BOTA's award of discovery sanctions to the taxpayer was an abuse of discretion.

The County appealed the trial court's ruling to the Court of Appeals. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

## I. 1995 AMENDMENTS TO K.S.A. 1994 SUPP. 79-1427a

At the time the appraiser first challenged the taxpayer's renditions in 1990, a 4-year statute of limitations applied to "escaped" assessments (K.S.A. 1990 Supp. 79-1427a). K.S.A. 1990 Supp. 79-1427a(c) provided that the statute of limitations applied to "any tangible personal property discovered during the calendar years 1982, 1983, and 1984, and any year thereafter to have escaped appraisal and taxation during any such year or any year within four years next preceding any such year." The 4-year statute of limitations replaced a 5-year statute of limitations. This statute was considered retroactive at the time it was enacted in 1985 because it included the "1982, 1983, and 1984" clause in subsection (c). Att'y Gen. Op. No. 95-90, pp. 3, 4 (citing Minutes of Senate Committee on Assessment and Taxation, January 23, 1985, and Attachment; Supplemental Note on S.B. 31, as amended by Senate Committee on Assessment and Taxation).

BOTA heard this case while the 4-year statute of limitations was in place, and BOTA held the County could recover escaped taxes for the tax years 1987, 1988, 1989, and 1990. BOTA only barred the County's collection of escaped taxes for the tax year 1986.

Both parties appealed BOTA's decision on this and other issues to the district court. The district court heard the case on July 19, 1993. The case was reargued in front of the district court on February 21, 1996, 3½ years later. In between these two argument

dates, the legislature amended 79-1427a effective July 1, 1995. This statute, as amended, provided in pertinent part:

"(a) If, the county appraiser discovers, after the tax roll has been certified to the county clerk, that any tangible personal property subject to taxation has been omitted from the tax rolls, the county clerk shall place such property on the tax roll as an added tax, or if, after one year from the date prescribed by K.S.A. 79-306, and amendments thereto, for the listing of tangible personal property, the county appraiser discovers that any tangible personal property which was subject to taxation in any year or years *within two years next preceding* January 1 of the calendar year it was discovered has not been listed or has been underreported for whatever reason, such property shall be deemed to have escaped taxation. In the case of property which has not been listed, it shall be the duty of the county appraiser to list and appraise such property and, for an added tax, add penalties as prescribed in K.S.A. 79-1422, and amendments thereto, and which shall be designated on the appraisal roll as an added appraisal for that year. In the case of property which has escaped taxation, it shall be the duty of the county appraiser to list and appraise such property and add 50% thereto as a penalty for escaping taxation for each such year during which such property was not listed, and it shall be designated on the appraisal roll as 'escaped appraisal' for each such preceding year or years. In the case of property which has been listed but underreported, it shall be the duty of the county appraiser to list and appraise the underreported portion of such property and add 50% thereto as a penalty for escaping taxation for each such year during which such property was underreported, and it shall be designated on the appraisal roll as 'escaped appraisal' for each such preceding year or years. The county clerk, upon receipt of the valuation for such property in either of the aforementioned cases, shall place such property on the tax rolls and compute the amount of tax due based upon the mill levy for the year or years in which such tax should have been levied, and shall certify such amount to the county treasurer as an added or escaped appraisal. . . .

. . . .

"(c) The provisions of this section shall apply to any tangible personal property discovered during the calendar years 1982, 1983, 1984 and any year thereafter to have escaped appraisal and taxation during any such year or any year within *two years next preceding* any such year." K.S.A. 79-1427a. (Emphasis added.)

The only issue before us is whether the amendments to 79-1427a applied retroactively and barred any claims for "escaped" taxes prior to 1990 (counting back 2 years from 1992 when the escaped taxes were discovered and placed on the tax rolls) or 1988 (counting back 4 years from 1992). We express no opinion whether 1991 or 1992 should have been used as the discovery date for the escaped assessments, as that issue is not before us.

The Department of Revenue first addressed the issue of the retroactivity of K.S.A. 79-1427a. The 1995 amendments to 79-1427a became effective July 1, 1995. Approximately 2 months before this date, on April 24, 1995, legal counsel for the Department of Revenue, Property Valuation Division, sent a letter to Representative Phill Kline, the chairman of the House Assessment and Taxation Committee. This letter advised Representative Kline that the 1995 amendments to 79-1427a contained a retroactivity provision which allowed the amendment to apply to any taxes remaining unpaid as of its effective date. The letter also noted that the Revisor of Statutes Office had been consulted and concurred in this interpretation.

Later, BOTA also found that the 1995 amendments to 79-1427a should be applied retroactively. *In the Matter of the Protests of Flint Oak Ranch for Taxes Paid for 1988, 1989, 1990, 1991, and 1993, in Elk County, Kansas*, Docket Nos. 92-17264-PR *et seq*. In so ruling, BOTA focused on the phrase "any year thereafter" in subsection (c) of the amended statute. According to BOTA, this language indicates the provisions of subsection (c), including the shortened statute of limitations, apply to any year after 1982 in which a county discovers escaped property. As such, BOTA concluded in the *Flint Oak* case that the legislature intended for the 1995 amendments to be applied retroactively, pursuant to the retroactivity language in the amended subsection (c). Hence, BOTA held that counties are barred, under the 1995 amendments to 79-1427a, from collecting an unpaid escaped property assessment that extends back more than 2 years from the date of discovery of the assessment, even if the escaped personal property assessment was placed on the tax rolls prior to July 1, 1995, the effective date of the 1995 amendments. In this case, the district court apparently relied on the *Flint Oak* BOTA opinion and the Department of Revenue letter. Thus, the district court ruled that the 1995 amendments to 79-1427a should be applied retroactively. In so holding, the district court stated:

"After this matter was briefed and argued to the court, the Kansas legislature amended K.S.A. 79-1427a, changing the four year assessment period to a two year one. Moreover, the language of the legislature's amendment indicates that the

shortened assessment period was to be retroactive. Therefore, under the current law, which relates back to this period, only assessments for the two years next preceding the date of assessment may be permitted; all other assessments are barred."

Thus, the district court herein held that the County's escaped assessments for 1990 were proper, while the assessments for tax years 1989, 1988, 1987, 1986, and 1985 were time barred. Since BOTA only barred the County's assessments for tax years 1985 and 1986 and permitted the County to collect escaped assessments for the tax years 1987, 1988, and 1989, the district court altered BOTA's order. The district court only allowed the County to collect the escaped assessments which occurred in 1990. The County could have also collected escaped assessments for tax years 1991 and 1992 since the escaped assessments were placed on the tax rolls in 1992. However, apparently, the County did not discover any escaped assessments for these years.

On appeal, the County asks this court to reinstate the escaped assessment and penalties for the tax years 1988 and 1989 and not bar them. After the briefs for this appeal were filed, BOTA filed a decision on September 11, 1997, in which it reversed the position it took in *Flint Oak* concerning the retroactivity of the 1995 amendments to 79-1427a. *In the Matter of the Protest of Triad Associates, Inc. for Taxes Paid for 1989-93 in Sedgwick County, Kansas*, Docket No. 94-1213-PR. Without discussing the prior case (*Flint Oak*) in which it held K.S.A. 79-1427a applied retroactively, BOTA held that the 1995 amendments to 79-1427a should not be applied retroactively, but prospectively only.

Determining whether K.S.A. 79-1427a applies the new 2-year statute of limitations for personal property tax assessments retroactively is a question of law. "When determining a question of law, this court is not barred by the decision of the district court," but our review is unlimited. *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986); see *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997).

The language in subsection (c) of 79-1427a originally made the statute apply retroactively when it was enacted in 1985. See Att'y Gen. Op. No. 95-90. The legislature is presumed to know the law.

*Friday v. Trinity Universal of Kansas*, 262 Kan. 347, 350, 939 P.2d 869 (1997). Thus, the legislature presumably was aware of the prior retroactive application of 79-1427a based on the language in subsection (c). In the 1995 amendments, the legislature changed subsection (c) by shortening the statute of limitations from 4 years to 2 years, but it specifically reenacted the retroactivity language. Thus, this language still clearly indicates that the legislature intended the amended K.S.A. 79-1427a to operate retroactively, just as this original language in subsection (c) indicated that the original 79-1427a should also be applied retroactively. See *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255 (1997); L. 1985, ch. 309, § 1 (original 79-1427a); Minutes of Senate Committee on Assessment and Taxation, January 23, 1985, and Attachment 1; Supplemental Note on S.B. 31, as amended by Senate Committee on Assessment and Taxation.

The legislature did not limit this retroactivity language in subsection (c) to only the original statute and exclude its retroactive effect from the 1995 amendments. Indeed, the legislature was aware that the Department of Revenue planned to interpret the 1995 amendments retroactively, but it did nothing to prevent or disapprove of such an interpretation. BOTA originally followed the Department of Revenue's ruling, but has recently changed its position on this issue. Due to the lack of explanation as to why it changed its position on this issue, BOTA's ruling that the amendments should only be applied prospectively is not as persuasive as it might otherwise be. A vital part of subsection (c) is the statute of limitations, which the legislature amended in 1995. It could have struck out the retroactivity language at this time. It did not do so. As such, the legislature intended for the 1995 amendments, including the shortened statute of limitations, to be applied retroactively, pursuant to the reenacted retroactivity language in subsection (c). The Department of Revenue informed the legislature that it planned to apply the amendments retroactively, and the legislature acquiesced in this interpretation of the statute.

By applying the 1995 amendments to 79-1427a, including the new 2-year statute of limitations, retroactively to the taxpayer's pending tax assessments, which were placed on the tax rolls in

1992, the County is only allowed to collect escaped assessment for the tax years 1992, 1991 (for which none is claimed), and 1990, and the County is barred from collecting assessments for any prior tax years. The County's challenge to this issue fails.

## II. ABATEMENT OF THE TAXPAYER'S PENALTIES

### K.S.A. 79-1422 provides in pertinent part:

"(b) If, within one year following the date prescribed by K.S.A. 79-306 [March 15], and amendments thereto, any person shall fail to make and file the statement listing property for assessment and taxation purposes or shall fail to make and file a full and complete statement listing property for such purposes, the appraiser shall proceed to ascertain the assessed value of the property of such taxpayer, and for this purpose the appraiser may examine under oath any person or persons whom the appraiser deems to have knowledge thereof. The appraiser shall, after having ascertained the assessed value of such property, add 50% thereto as a penalty for failure to file such statement or for failure to file a full and complete statement.

"(c) *The board of tax appeals shall have the authority to abate any penalty imposed under the provisions of this section and order the refund of the abated penalty, whenever excusable neglect on the part of the person required to make and file the statement listing property for assessment and taxation purposes is shown,* or whenever the property for which a statement of assessment was not filed as required by law is repossessed, judicially or otherwise, by a secured creditor and such secured creditor pays the taxes and interest due." (Emphasis added.)

### K.S.A. 79-1427a provides:

"(a) If, the county appraiser discovers, after the tax roll has been certified to the county clerk, that any tangible personal property subject to taxation has been omitted from the tax rolls, the county clerk shall place such property on the tax roll as an added tax, or if, after one year from the date prescribed by K.S.A. 79-306, and amendments thereto, for the listing of tangible personal property, the county appraiser discovers that any tangible personal property which was subject to taxation in any year or years within two years next preceding January 1 of the calendar year in which it was discovered has not been listed or has been under-reported for whatever reason, such property shall be deemed to have escaped taxation. In the case of property which has not been listed, it shall be the duty of the county appraiser to list and appraise such property and, for an added tax, add penalties as prescribed in K.S.A. 79-1422, and amendments thereto, and which shall be designated on the appraisal roll as an added appraisal for that year. In the case of property which has escaped taxation, it shall be the duty of the county appraiser to list and appraise such property and add 50% thereto as a penalty for escaping taxation for each such year during which such property was not listed,

and it shall be designated on the appraisal roll as 'escaped appraisal' for each such preceding year or years. In the case of property which has been listed but under-reported, it shall be the duty of the county appraiser to list and appraise the underreported portion of such property and add 50% thereto as a penalty for escaping taxation for each such year during which such property was underreported, and it shall be designated on the appraisal roll as 'escaped appraisal' for each such preceding year or years. The county clerk, upon receipt of the valuation for such property in either of the aforementioned cases, shall place such property on the tax rolls and compute the amount of tax due based upon the mill levy for the year or years in which such tax should have been levied, and shall certify such amount to the county treasurer as an added or escaped appraisal. The amount of such tax shall be due immediately and payable within 45 days after the issuance of an additional or escaped property tax bill by the county treasurer. No interest shall be imposed unless the tax remains unpaid after such 45 day period. Taxes levied pursuant to this section which remain unpaid after such 45 day period shall be deemed delinquent and the county treasurer shall collect and distribute such tax in the same manner as prescribed by law for the collection and distribution of other taxes levied upon property which are delinquent. If the owner of such property is deceased, taxes charged as herein provided shall be levied against the estate of such deceased person for only two calendar years preceding death and shall be paid by the legal representative or representatives of such estate. In the event that such escaped appraisal is due to any willful or clerical error of the county appraiser, such property shall be appraised at its fair market value and no penalty shall be added.

"(b) A taxpayer with a grievance as to any penalty applied pursuant to the provisions of this section, may appeal to the state board of tax appeals on forms prepared by the state board of tax appeals and provided by the county appraiser. *The state board of tax appeals shall have the authority to abate any penalty imposed under the provisions of this section and order the refund of the abated penalty, whenever excusable neglect on the part of the person required to make and file the statement listing property for assessment and taxation purposes is shown*, or whenever the property which has been deemed to have escaped taxation is repossessed, judicially or otherwise, by a secured creditor and such creditor pays the taxes and interest due. No interest shall be assessed during the pendency of this appeal.

"(c) The provisions of this section shall apply to any tangible personal property discovered during the calendar years 1982, 1983, 1984 and any year thereafter to have escaped appraisal and taxation during any such year or any year within two years next preceding any such year." (Emphasis added.)

When the escaped assessments were placed on the tax rolls in 1992, this statute imposed a 100% penalty. However, while this case was pending in the district court, amendments to the statute

were enacted in 1995 which only imposed a 50% penalty on escaped assessments. The district court abated the taxpayer's penalty to 10% based on excusable neglect. As such, the question of which penalty applies—100% or 50%—is irrelevant unless the district court's reduction is found to be improper.

Based on these statutes, two types of statutory penalties were at issue in the BOTA case. The personal property assessments listed on the tax rolls in 1992 for tax years 1986, 1987, 1988, and 1989 must be classified as an attempt to recapture personal property values which were not on the taxpayer's original renditions and therefore represent "escaped" assessments. Thus, pursuant to 79-1427a, the Sedgwick County Appraiser applied a 100% mandatory statutory penalty to the taxpayer's "escaped" assessments for the tax years 1986, 1987, 1988, and 1989. The personal property assessments listed on the tax roll in 1992 for the tax year 1990 represent a "late filing" of the taxpayer's rendition. Thus, pursuant to 79-1422, the Sedgwick County Appraiser's Office applied a 50% mandatory statutory penalty to the taxpayer's "late" filings for the tax year 1990. According to the appraiser's office, it imposed both types of penalties against the assessments at issue because of its statutory duty to do so. The appraiser's office asserts that nothing in these statutes gave it the authority to reduce the mandatory penalties.

However, both statutes give BOTA the power to abate both types of penalties whenever "excusable neglect on the part of the person required to make and file the statement listing property for assessment and taxation purposes is shown." K.S.A. 79-1422(c); K.S.A. 79-1427a(b). This is exactly what BOTA did. It found excusable neglect on the part of the taxpayer for its late filings and escaped assessments. Thus, it abated the taxpayer's penalties from 50% and 100% to 10%. The trial court affirmed BOTA's ruling, and the County appeals this ruling.

However, the taxpayer claims that the trial court properly decided this issue. As the taxpayer points out, it did not have the expertise in-house to manage its personal property tax affairs, so it took a common step of relying on a professional in the field, SSB, to handle these affairs. The taxpayer provided information showing

its personal property purchases to SSB, and SSB made property tax filings for the taxpayer for several years, with no indication of a problem. According to the taxpayer, this conduct amounted to excusable neglect and justified BOTA and the trial court's abatement of its penalties.

Both parties ask the court to interpret the meaning of the term "excusable neglect" as used within K.S.A. 79-1422 and 79-1427a. Does the term mean that excusable neglect must exist at the time the taxes are due or at the time the tax problems are discovered? Moreover, does a taxpayer exercise excusable neglect by relying heavily on a tax preparer without ever checking the preparer's accuracy?

"Interpretation of a statute is a question of law, and our review is unlimited." *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1. "It is the function of a court to interpret a statute to give it the effect intended by the legislature.

"Usually, interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to great judicial deference. The agency's interpretation of a challenged statute may, in fact, be entitled to controlling significance in judicial proceedings. Further, if there is a rational basis for the agency's interpretation, it should be upheld on judicial review." *In re Application of Zivanovic*, 261 Kan. 191, Syl. ¶ 4, 929 P.2d 1377 (1996). See *City of Wichita v. Public Employee Relations Bd.*, 259 Kan. 628, 630-31, 913 P.2d 137 (1996); *State Dept. of Administration v. Public Employees Relations Bd.*, 257 Kan. 275, 281, 894 P.2d 777 (1995).

"If, however, the ruling court finds that the administrative body's interpretation is erroneous as a matter of law, the court should take corrective steps; the determination of an administrative body of questions of law is not conclusive, and, while persuasive, is not binding on the courts." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 9, 834 P.2d 368 (1992). See *National Council on Compensation Ins. v. Todd*, 258 Kan. 535, Syl. ¶ 3, 905 P.2d 114 (1995); *Hixon v. Lario Enterprises, Inc.*, 257 Kan. 377, 379, 892 P.2d 507 (1995).

"BOTA is a specialized agency that exists to decide taxation issues. BOTA's decisions should be given great credence and deference when it is acting in its area of expertise. However, if we find that BOTA's interpretation is erroneous as a matter of law, we should take corrective steps." *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 3. See *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 447, 885 P.2d 1233 (1994).

"The party challenging the validity of the agency's action bears the burden of proving the invalidity of the action." *In re Application of Zivanovic*, 261 Kan. 191, Syl. ¶ 3. See also *Hedrick v. U.S.D. No. 259*, 23 Kan. App. 2d 783, Syl. ¶ 1, 935

P.2d 1083 (1997) (whether agency has erroneously interpreted the law is a question of law).

Applying these rules of construction to K.S.A. 79-1422 and 79-1427a, the question is whether a taxpayer acts in a manner to constitute excusable neglect, so as to abate his or her tax penalties, simply by delegating all the tax preparation responsibilities to an agent (a professional tax preparer) without ever checking the tax preparer's accuracy. *Beverly California Corp. v. State*, 23 Kan. App. 2d 680, 934 P.2d 992 (1997); and *Columbia Savings Ass'n v. McPheeters*, 21 Kan. App. 2d 919, 911 P.2d 187 (1996), support a negative answer to this question. Both of these cases deal with what acts constitute "excusable neglect" as that term is used in various statutes.

The *Beverly* case involved seven claims for unemployment compensation from five employers. An examiner for the Kansas Department of Human Resources mailed the employers notices of the unemployment claims. Each notice included a form for the employer to fill out and return to the examiner if the employers sought to challenge the claim against the employers' unemployment compensation fund. A claims analyst working for the employers' representative did not complete or sign the forms. However, the analyst returned the forms to the examiner with a letter attached stating that the employers were protesting the unemployment claim charges against their accounts.

The examiner ruled that the employers failed to furnish the required information to challenge the unemployment claim within 10 days of receiving notice of the claim. The employers appealed, and an agency referee found that the employers had waived standing to challenge the claims because they failed to complete the forms properly within 10 days of receiving notice of the claim. Eventually, the employers appealed to the Court of Appeals.

The Court of Appeals affirmed the referee and Board's ruling that "the incompetence of the representative hired by the Employers to process such claims did not excuse the Employers' failure to secure standing to challenge the claims." 23 Kan. App. 2d at 684. According to the board and the Court of Appeals, "the

reason the forms were not completed in these cases—the representative's incompetence—did not amount to excusable neglect on the part of the Employers." 23 Kan. App. 2d at 685. The court found that this view by the board was rational because "[i]f the incompetence of one hired to perform a specific task were considered excusable neglect, the excusable neglect exception would swallow the rule requiring that the task be performed in the first instance." 23 Kan. App. 2d at 685. Based on this ruling, the Court of Appeals found that the employers did not have standing to challenge the claims against their unemployment compensation accounts, and it affirmed the district court's dismissal of the employers' appeal. *Cf. Montez v. Tonkawa Village Apartments*, 215 Kan. 59, 60-61, 64-65, 523 P.2d 351 (1974) (apartment manager, served with papers for a lawsuit, lost papers and never told the apartment owners about the suit, so no answer to the lawsuit was ever filed; this court found that the manager's actions amounted to excusable neglect on behalf of the apartment owner, allowing the owner to void a default judgment and have additional time to file an answer).

In the *Columbia* case, the Columbia Savings Association filed a petition to foreclose construction loan mortgages on 10 tracts of real estate. The petition involved various defendants and many lienholders, including a mechanic's lienholder, RSC Electric, Inc.

"RSC filed its answer and motion to file the answer out of time on July 14, 1994. As justification for its late filing, RSC claimed it sought the advice of counsel, who said that RSC did not have a meritorious defense. When RSC later discovered that its mechanic's lien had priority over Columbia's mortgages, RSC moved to file its answer out of time.

"The trial court denied RSC's motion to file its answer out of time. The trial court later granted default judgment against RSC. RSC timely appeal[ed]." 21 Kan. App. 2d at 920.

On appeal, RSC pointed to K.S.A. 60-206(b), under which a trial court may allow a party to file pleadings out of time where the failure to act was the result of excusable neglect. In analyzing whether RSC's acts constituted excusable neglect, the Court of Appeals cited *Boyce v. Boyce*, 206 Kan. 53, 55, 476 P.2d 625 (1970), which provided:

" 'What constitutes excusable neglect under the statute must be determined by the trial court on a case by case basis under the facts presented in support of and in opposition to the enlargement of time. The trial court should consider the circumstances under which the neglect to act occurred as well as the effect of an enlargement upon the rights of all parties affected thereby.

" 'When a party in default seeks an enlargement of time based upon excusable neglect under K.S.A. 60-206(b), his request should be supported by evidence of his good faith, he should establish a reasonable excuse for his failure and he should show that the interests of justice can be served by granting the enlargement. After considering these matters the determination should rest in the sound judicial discretion of the trial court.' 206 Kan. at 55-56" 21 Kan. App. 2d at 920.

In *Columbia*, RSC argued that its failure to file a timely answer was justified by excusable neglect.

"RSC sought the advice of counsel and was erroneously advised that there was no meritorious defense to Columbia's foreclosure action. RSC later learned that it had first provided the goods and services giving rise to its mechanic's lien 8 days before Columbia filed its mortgages with the Douglas County Register of Deeds. Thus, RSC did have a meritorious defense. RSC then filed its answer and motion to answer out of time." 21 Kan. App. 2d at 925.

The trial court found that these facts did not constitute excusable neglect because they indicated that RSC had intentionally chosen not to answer Columbia's petition. Further, the trial court found that RSC knew or should have known when it started work. As such, the trial court concluded, RSC had all the information necessary to assist its defense and its acts did not constitute excusable neglect so as to excuse the late assertion of its defense. The trial court denied RSC's motion to file its answer out of time, and the Court of Appeals affirmed the trial court, finding that it had not abused its discretion. 21 Kan. App. 2d at 925-26.

Based on these cases, the taxpayer's reliance on its tax preparer, SSB, does not constitute excusable neglect for its failure to accurately file its personal property tax renditions and cannot be used to abate the taxpayer's penalties. In *Beverly*, the incompetence of the representative hired by the employers and the employers' reliance on such representative did not constitute excusable neglect so as to justify the employers' failure to properly challenge the unemployment claims. The same is true here. The errors of the representative, SSB, hired by the taxpayer, and the taxpayer's re-

liance on SSB did not constitute excusable neglect so as to justify the taxpayer's failure to accurately file its personal property tax renditions. As in *Beverly*, if the incompetence of the tax preparer hired to file taxpayer's taxes was considered excusable neglect, then the excusable neglect exception would swallow the rule which requires that the taxpayer itself is responsible for timely and accurately filing its own personal property taxes. K.S.A. 79-306 (creates annual duty for taxpayer to accurately and timely file its personal property tax renditions).

In *Columbia*, RSC's reliance on the erroneous advice of its attorney did not constitute excusable neglect. Herein, the taxpayer's reliance on the inaccurate filing of its tax preparer did not constitute excusable neglect. The taxpayer has the legal responsibility to timely and accurately file its personal property taxes; thus, it should ensure that its tax preparer is doing so or it must suffer the penalties. To hold otherwise would encourage taxpayers to turn a blind eye to their tax preparer's inaccurate and untimely filing so that it may allege total reliance on its tax preparer and escape penalties due to this excusable neglect. Thus, the taxpayer's reliance on SSB to prepare its taxes is not excusable neglect to justify the taxpayer's inaccurate and untimely filings or to abate the penalties for such filings. If there was evidence that SSB's acts constituted excusable neglect for the improper filings, then this excusable neglect of the taxpayer's agent may have been attributable to the taxpayer so as to abate the taxpayer's penalties for the improper filings. However, this was not the case here. There was no evidence of SSB's conduct during the time it prepared the filings for the taxpayer or evidence that this conduct constituted excusable neglect. Thus, neither SSB nor the taxpayer's conduct during the time the taxes were filed constituted excusable neglect so as to abate the penalties. However, the taxpayer's conduct in working with SSB can be considered in evaluating good faith. Here, there is no evidence that the taxpayer withheld relative information from SSB or in any way aided, authorized, or encouraged SSB to file erroneous renditions.

The taxpayer also claims that its own proactive conduct once the improper filings were discovered constituted excusable neglect so as to abate the penalties. In support of this argument, the taxpayer

points to all of the actions it took once the improper filings were discovered to help properly list its personal property and resolve the tax problems with the appraiser's office. For instance, it produced documents, met with the County and AGH, conducted a walk-through inspection of two of its properties, and participated in revising the AGH listing.

In response, the County claims that the taxpayer's excusable neglect, which can be used to justify the improper tax filings, is only that conduct which occurred during the time taxes were improperly filed. According to the County, the taxpayer's conduct, which occurred after the tax problems were discovered, cannot constitute excusable neglect to justify the taxpayer's improper renditions that were previously filed. Thus, the County asserts that all the conduct cited by the taxpayer, which occurred after the tax problems were discovered, is irrelevant and does not support BOTA's abatement of the taxpayer's penalties.

K.S.A. 79-1422 and 79-1427a are tax statutes and BOTA's interpretation of tax statues is to be given deference. BOTA interpreted "excusable neglect" as a justifiable failure to properly file taxes or as a legitimate attempt to correct tax problems once they were discovered. This definition of excusable neglect creates an incentive for taxpayers to actively try and resolve tax problems with the Appraiser's Office once they are discovered. If the taxpayer does so, then this is considered excusable neglect and some of the taxpayer's penalties may be abated at BOTA's discretion. Further, this definition does not create a negative incentive for taxpayers to inaccurately file their taxes because even if the taxpayer actively tries to resolve the tax problems once they are discovered, the taxpayer is still responsible for the interest due on the overdue taxes and probably some percentage of penalties (10% in this case). Thus, BOTA's interpretation of excusable neglect—a taxpayer's justifiable failure to properly file taxes or a taxpayer's legitimate efforts to correct tax problems once discovered—creates nothing but positive results.

Since BOTA's interpretation of the tax statutes, and the terms within them, is entitled to deference, this court adopts BOTA's interpretation of the term "excusable neglect" as it is used in K.S.A.

79-1422 and 79-1427a. Using this definition, BOTA found that the taxpayer's legitimate efforts to resolve the tax problems once they were discovered amounted to excusable neglect. We hold that BOTA did not abuse its discretion in finding that the taxpayer's efforts met BOTA's definition of excusable neglect. As such, BOTA was statutorily authorized, pursuant to K.S.A. 79-1422 and 79-1427a, to abate some of the taxpayer's penalties. The trial court affirmed BOTA's ruling. This issue fails.

### III. DISCOVERY SANCTIONS

The taxpayer filed 26 tax grievances with BOTA. As part of its discovery for these grievances, it took the depositions of two AGH accountants who had contracted with the County to help prepare accurate renditions of the taxpayer's personal property. Throughout the depositions, the County asserted the CPA-client privilege. It did not allow the AGH accountants to answer any questions about the work they had done for the County in regards to the taxpayer's renditions. Since the County would not allow the AGH accountants to answer any significant questions, the taxpayer terminated the depositions. Then, the taxpayer filed a motion to compel, asking BOTA to order the County to stop asserting the CPA-client privilege in the taxpayer's depositions of the AGH accountants. The taxpayer also requested an award of costs against the County, to recover the expenses it incurred in filing the motion to compel.

After hearing arguments on the merits of the taxpayer's tax grievances, BOTA issued an order. This order granted the taxpayer's motion for costs in bringing the motion to compel due to the County's improper assertion of the CPA-client privilege. The County appealed this ruling, among others, to the district court. The district court affirmed the discovery sanction which BOTA assessed against the County.

On appeal, the County challenges this ruling. As the County points out, Kansas has a very broad CPA-client privilege appearing at K.S.A. 1997 Supp. 1-401, which provides:

"(a) Except as otherwise provided in this section, all statements, records, schedules and memoranda, commonly known as working papers, made by a certified

public accountant, or by any employee of a certified public accountant, incident to, or in the course of professional service to clients by such certified public accountant, except reports delivered to a client by such certified public accountant, shall be and remain the property of such certified public accountant in the absence of a written agreement between the certified public accountant and the client to the contrary.

"(b) No certified public accountant shall be examined through judicial process or proceedings without the consent of the client as to any communication made by the client to the certified public accountant in person or through the media of books of account and financial records, or as to advice, reports or working papers given or made thereon in the course of professional employment, nor shall a secretary, stenographer, clerk or assistant of a certified public accountant be examined without the consent of the client concerned, concerning any fact the knowledge of which any such person has acquired in such capacity or relationship with the certified public accountant. Nothing in this section shall be construed as limiting the authority of this state or of the United States or any agency of this state or of the United States to subpoena books of account, financial records, reports or working papers or other documents and use such information in connection with any investigation, public hearing or court proceeding. This privilege shall not exist when any such communication is material to the defense of an action against a certified public accountant and as otherwise provided by this section.

"(c) Nothing in subsection (a) shall prohibit a certified public accountant, or any employee of a certified public accountant, from disclosing any data to any other certified public accountant, or anyone employed by a certified public accountant in connection with peer reviews of such certified public accountant's accounting and auditing practice. Nothing in subsection (a) shall prohibit the board of accountancy from securing working papers in connection with any investigation authorized under law. Nothing in subsection (b) shall prohibit a certified public accountant or anyone employed by a certified public accountant from disclosing any data to any other certified public accountant or anyone employed by a certified public accountant in connection with peer reviews of such certified public accountant's accounting and auditing practice nor shall such disclosure waive the privilege. Persons conducting such peer reviews shall be subject to the same duty of confidentiality in regard to such data as is applicable to certified public accountants under this section.

"(d) As used in this section, 'certified public accountant' means a person who holds a permit from the board of accountancy to engage in practice as a certified public accountant in this state."

According to the County, the plain language of 1-401 prohibits the CPAs at AGH from being "examined through judicial process or proceedings . . . as to any communication made" by Sedgwick

County to AGH without Sedgwick County's (the client's) consent. See K.S.A. 1997 Supp. 1-401(b). Further, the County points out that, under the statute, the term communication extends to cover not only verbal communication between the County and AGH but also covers "advice, reports or *working papers* given or made thereon in the course of professional employment." The statute defines working papers as those documents which were generated by AGH "incident to, or in the scope of, professional service to" the County. Thus, the County claims that almost all of the documents generated by AGH were protected from discovery by the CPA-client privilege because they were made in the course of professional employment between a CPA and a client (the County) and qualify as working papers.

The County acknowledges that the taxpayer's new personal property renditions, prepared by AGH and transmitted to the County for assessment purposes, were not "working papers" and were outside the scope of the CPA-client privilege because they were based on the taxpayer's own internal books and records. However, the County claims that all other documents generated by AGH but not transmitted to the County constituted working papers and were protected from discovery. Thus, the County asserts that it was entitled to protect the AGH CPAs from testifying at the depositions regarding all advice, reports, communications, and working papers between AGH and the County, which AGH had generated but had not transmitted to the County. Accordingly, the County submits that each one of the CPA-client privilege objections it raised at the taxpayer's depositions of the AGH CPAs was well-grounded in language of the CPA-client privilege statute, given the extremely broad parameters of the privilege.

K.S.A. 60-237 provides for a *mandatory* award of expenses for a motion to compel unless the opposition to the motion was substantially justified or other circumstances make an award of expenses unjust. BOTA's decision and the district court's order that the County's position was not substantially justified must be affirmed if any reasonable person could agree with it. See *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740-41, 822 P.2d 617 (1991) (holding that one attacking evidentiary rulings must show an abuse

of discretion). BOTA's order of May 6, 1992, which granted the motion to compel, stated in pertinent part:

"The Board finds that the accountant-client privilege *may be applicable* in this matter during the gathering and investigating state of preparing the supplemental renditions. However, once the supplemental renditions are complete and have been returned to the County Appraiser and additional assessments are sent to the taxpayer, *the County waives the privilege by placing the supplemental renditions at issue.* Therefore, the Board concludes that Sedgwick County may not assert the accountant-client privilege where the accountant assists the appraiser in reviewing the taxpayer's financial statements and prepares supplemental renditions at the direction of the County Appraiser from which the County issues supplemental tax statements." (Emphasis added.)

BOTA reserved its ruling on costs for a later date. In its order on January 29, 1993, BOTA addressed that issue as follows:

"The Board finds that while reasonable advocates may disagree over the applicability of the accountant/client privilege in a matter, the County's conduct in refusing to allow the Taxpayers to discover the underlying basis for the County's additional assessments was not substantially justified. The Board concludes that the Taxpayers' Motion for Costs should be granted but limited to a maximum of $1,500."

The text of the County's brief focuses primarily on the motion for costs, not on the existence of a CPA-client privilege in this case. The taxpayer did not depose the AGH accountants a second time or need their testimony because the parties reached an agreement on how much escaped taxes the taxpayer owed. Moreover, BOTA ruled that the taxpayer could not ask deposition questions of the AGH accountants regarding the work they did for the County, regardless of the applicability of the CPA-client privilege, due to the inquisition privilege. Thus, the question of whether a CPA-client privilege actually existed in this case is moot.

This issue deals with BOTA's award and the district court's award of discovery sanctions pursuant to K.S.A. 60-237. "The award of sanctions, including attorney fees, for discovery violations is within the discretion of the trial court." *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, 680, 844 P.2d 768 (1993); see *Dickinson, Inc. v. Balcor Income Properties, Ltd.*, 12 Kan. App. 2d 395, 401, 745 P.2d 1120 (1987), *rev. denied* 242 Kan. 902 (1988). "A court abuses its discretion when it reaches a

decision with which no reasonable person could agree. If any reasonable person could agree, the decision must be affirmed." *City of Arkansas City v. Anderson*, 19 Kan. App. 2d 344, 349, 869 P.2d 244, *rev. denied* 255 Kan. 1000 (1994) (finding that the decision to award fees was based on the facts of the case, not the law; and while the trial court could have found otherwise, the Court of Appeals found no abuse of discretion).

Both BOTA and the district court were correct in awarding the costs of the motion to compel to the taxpayer under K.S.A. 60-237. Under 60-237(a)(4), if a motion to compel discovery is granted, as it was here, then the court *shall* require the party opposing the motion to pay the costs of the motion, including attorney fees, unless opposition to the motion was substantively justified or other circumstances made the sanction unjust. Thus, under the statute, the court was required to order sanctions *unless* it found a substantial justification or other unjust circumstances not to do so. Here, BOTA and the trial court could have easily found substantial justification not to award sanctions because the issue of whether the CPA-client privilege applied to this circumstance had never been previously discussed or decided in Kansas.

However, just because BOTA and the district court could have refused to award sanctions without abusing their discretion, this does not mean that they actually abused their discretion by awarding sanctions. On the contrary, the district court and BOTA simply followed the statute (K.S.A. 60-237) and awarded sanctions based on the County's opposition to the motion to compel. The County took a risk in asserting opposition to the motion on an undecided question of law, and it lost. This alone is not always a substantial justification to oppose a motion to compel and avoid costs of the motion. All positions taken in law are a risk. Some parties assert positions which are contrary to the law in hopes that the law will be changed. These positions are often taken in good faith, but this does not create a substantial justification so as to excuse the party from responsibility for the costs of opposing a motion to compel. Based on the facts of this case, the trial court and BOTA found no substantial justification to excuse the County from the responsibility for the costs of opposing the motion to compel. A reasonable

person could agree with the trial court on this determination. Neither BOTA nor the trial court abused their discretion in awarding the costs of the motion to compel to the taxpayer and against the County. This issue fails.

K.S.A. 60-237 was amended in 1997. This is a discovery statute and is more procedural than substantive. Thus, it may be applied retroactively. See *Rios v. Board of Public Utilities of Kansas City*, 256 Kan. 184, 191, 883 P.2d 1177 (1994) (Procedural laws are those that concern the manner and order of conducting suits, or the mode of proceeding to enforce legal rights. Substantive laws establish the rights and duties of parties. If an amendment is to a procedural statute and does not prejudicially affect the substantive rights of parties, the general rule is that all actions will be subject to the new procedure whether they accrued before or after the change in the law and whether or not a suit had been instituted.)

Under the amended K.S.A. 60-237, a party may file a motion to compel discovery and request appropriate sanctions. However, the motion must include certification that the movant in good faith attempted to confer with the nondisclosing party in an effort to secure disclosure without court action. Further, the motion shall describe the steps taken by all counsel to resolve the issues in dispute. K.S.A. 1997 Supp. 60-237(a)(2)(A). If the motion is granted, the court shall require the party opposing the motion to pay the reasonable expenses incurred in making the motion, including attorney fees, "unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure . . . was substantially justified or that other circumstances make an award of expenses unjust"). K.S.A. 1997 Supp. 60-237(a)(4)(B).

In this case, the taxpayer's motion to compel discovery did not include "certification" that it had attempted to confer in good faith with the nondisclosing party in an effort to secure disclosure without court action. However, the taxpayer's supporting memorandum to its motion to compel does describe the steps taken by it to resolve the issue in dispute. For instance, the taxpayer tried to discover the requested information by deposing staff members from

the appraiser's office not accountants in AGH's office. When this was unsuccessful, the taxpayer sent a letter to the appraiser's office explaining its position and asking the County to waive its claim to the CPA-client privilege. The County did not waive its position, but told the taxpayer to go ahead and file its motion to compel. When BOTA and the trial court awarded discovery sanctions to the taxpayer, they did not make specific findings that taxpayer made a good faith effort to obtain disclosure, as required by K.S.A. 1997 Supp. 60-237. However, a good faith effort on behalf of the taxpayer is clear from the record. Thus, even under the amended K.S.A. 60-237, neither BOTA nor the district court erred in awarding the taxpayer the costs of its motion to compel, including attorney fees.

Affirmed.